Case 2:21-cv-14487-AMC   Document 1-4   Entered on FLSD Docket 12/18/2021   Page 1 of 170

**Exhibit D**

Atkinson-Baker Court Reporters
www.depo.com

1    IN THE CIRCUIT COURT, NINETEENTH
     JUDICIAL CIRCUIT, IN AND FOR
2    ST. LUCIE COUNTY, FLORIDA

3    CASE NO.:  2014 CA 002440

4    NATIONSTAR MORTGAGE, LLC,

5         Plaintiff,

6    vs.

7    JOSEPH P. AKOWSKEY and
     PAULINE E. AKOWSKEY a/k/a
8    PAULINE AKOWSKEY, et al.,

9         Defendant(s).

10   _____/

11

12   PROCEEDINGS:          NON-JURY TRIAL

13   BEFORE:               Honorable William L. Roby

14   DATE:                 Wednesday, November 16, 2016

15   TIME:                 1:41 p.m. - 05:29 p.m.

16   PLACE:                St. Lucie County Courthouse
                           218 South Second Street
17                         Fort Pierce, Florida 34950

18

19   DIGITALLY REPORTED
     AND TRANSCRIBED BY: Marialaina Rintone, CER/CET

20

21   MARIALAINA RINTONE, CER/CET 177
     Atkinson-Baker, Inc.
22   (800) 288-3376
     Www.depo.com
23   Job No. A90D0FF
     Reference No. 14-61715

24

25

1

Atkinson-Baker Court Reporters
www.depo.com

```
1    A P P E A R A N C E S:

2

3    LAURENCE BARSKY, ESQUIRE
     OF: Robertson, Anschutz & Schneid, P.L.
4        6409 Congress Avenue
         Suite 100
5        Boca Raton, Florida 33487
         561-241-6901 x1130
6        Lbarsky@rasflaw.com

7        APPEARING ON BEHALF OF THE PLAINTIFF

8

9    W. TRENT STEELE, ESQUIRE
     OF: Law Offices of W. Trent Steele
10       10995 SE Federal Highway
         Hobe Sound, Florida 33455
11       772-408-6969
         Trent@trentsteele.com
12
         APPEARING ON BEHALF OF THE DEFENDANT
13

14

15

16

17

18

19

20

21

22

23

24

25
```

2

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1                    I N D E X

2     OPENING STATEMENT BY MR. STEELE.....................15

3

4     PLAINTIFF'S WITNESS:

5     TESTIMONY OF ILOSH AZARSEPANDAN

6          Direct Examination by Mr. Barsky...............61

7          Cross-Examination by Mr. Steele................92

8          Redirect Examination by Mr. Barsky............130

9

10    DEFENDANT'S WITNESS:

11    TESTIMONY OF JOSEPH AKOWSKEY

12         Direct Examination by Mr. Steele...............21

13         Cross-Examination by Mr. Barsky................45

14         Redirect Examination by Mr. Steele.............58

15

16    CLOSING ARGUMENT BY MR. BARSKY ....................147

17    CLOSING ARGUMENT BY MR. STEELE.....................154

18    RULING BY THE COURT................................166

19    CERTIFICATE OF REPORTER............................170

20

21
22                INDEX CONTINUED ON FOLLOWING PAGE

23

24

25

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
1                  I N D E X  (CONTINUED)

2                    INDEX OF EXHIBITS

3

4    PLAINTIFF'S EXHIBITS
```

```
5    EXHIBIT  1     Loan Modification Agreement..........53

6    EXHIBIT  2     Original Mortgage....................57

7    EXHIBIT  3     Hello Letter.........................67

8    EXHIBIT  4     Limited Power of Attorney ...........69

9    EXHIBIT  5     Original Note .......................71

10   EXHIBIT  6     Screenshot...........................76

11   EXHIBIT  7     Bailee Letter........................78

12   EXHIBIT  8     Assignment of Mortgage...............80

13   EXHIBIT  9     Certification of Possession.........81

14   EXHIBIT  10    Breach Letter........................81

15   EXHIBIT  11    Certified Copy of Breach Letter......83

16   EXHIBIT  12    Tracking for Breach Letter...........83

17   EXHIBIT  13    Copy of Return Receipt..............84

18   EXHIBIT  14    Payment History......................87

19   EXHIBIT  15    Nationstar Transaction History.......88

20   EXHIBIT  16    Loan Records.........................88

21   EXHIBIT  17    Judgment Figures Worksheet...........90

22   EXHIBIT  18    Bank of America Letter..............138
```

```
23

24

25          INDEX CONTINUED ON FOLLOWING PAGE
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1                    I N D E X (CONTINUED)

 2                     INDEX OF EXHIBITS

 3

 4     DEFENDANT'S EXHIBITS

 5     EXHIBIT  1     Mediation Letter....................25

 6     EXHIBIT  2     Bank of America Letter..............29

 7     EXHIBIT  3     Mediation Report....................34

 8     EXHIBIT  4     Modification Commitment.............39

 9     EXHIBIT  5     Nationstar Collection Notes.........107

10

11

12     REPORTER'S NOTE:  Exhibits mentioned above were retained

13     by the Court.

14

15

16                            _____

17

18

19

20

21

22

23

24

25
```

5

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1                 P R O C E E D I N G S

 2                      * * * * *

 3          THE COURT:  Good afternoon.  We are here on

 4     Case No. 2014 002440 -- Nationstar v. Akowskey.  We

 5     need to have everybody state their appearance, on

 6     behalf of Nationstar.

 7          MR. BARSKY:  Laurence Barsky.  It's

 8     L-a-u-r-e-n-c-e B-a-r-s-k-y.  I am the attorney for

 9     Nationstar.

10          THE COURT:  Okay.  On behalf of Akowskey.

11          MR. STEELE:  Trent Steele.

12          THE COURT:  Okay.  There was a motion filed in

13     this case seeking a continuance, and I denied it,

14     the claim being that the case wasn't ready for trial

15     because there was an outstanding motion to amend.

16          Now, I don't know who at the firm of Robertson,

17     Anschutz & Schneid is keeping track of what's going

18     on in this file, but it is -- it is apparent to me

19     that a number of attorneys are working on this file

20     and not speaking to each other or consulting with

21     each other before they file motions.

22          The reason I say that is, I spent 45 minutes

23     reviewing -- extensively reviewing this file prior

24     to trial today.  Not only is there -- has this case

25     been continued for trial before with nobody bringing
```

6

Trial
November 16, 2016

1      that issue up -- Mr. Barsky, your firm filed a

2      notice of readiness for trial asking for the Court

3      to set a trial on June 13, 2016.

4          Now, this motion to amend by the defendant was

5      filed on December 2, 2015, and since then we have

6      had the case set for trial at least once if not more

7      than once.  I directed you all to attend a docket

8      call where I asked if we were ready for trial.

9      Everyone said we were ready for trial.  There was a

10     notice of readiness for trial filed six months after

11     the defendant's motion to amend by interlineation,

12     saying this original action is at issue and ready to

13     be set for trial by the Court.  A trial in this

14     action shall be by the Court and not by a jury,

15     asking for two hours, et cetera.

16         And then I had you all come to docket call --

17     and on behalf of the plaintiff at docket call it was

18     Mr. Barsky -- Mr. Steele asked at docket call that

19     we set a discovery cut-off date of 11/5/2016, and no

20     one objected.  I said that would be fine.

21         I get an or -- I get a proposed order on

22     defendant's ore tenus motion in limine stating the

23     parties are to provide copies of all exhibits

24     intended to be used at trial, "On or before

25     November 5, 2016.  All exhibits not provided will

1       not be permitted for use at trial.  Two, the parties

2       are to make any witness intended to be called at

3       trial available for deposition on or before

4       November 5, 2016.  Any witness not made available

5       for deposition by that date shall not be allowed to

6       testify at trial."

7            I signed it -- I get it on -- I got it a couple

8       of days -- days ago on or about November 7th.  I

9       signed it, November 7th, nunc pro tunc to

10      October 21st, the time of the docket call.

11           Then, for some inexplicable reason, plaintiff

12      filed a motion for a protective order as to

13      defendant and their witness who will be testifying

14      here at trial today for deposition duces tecum,

15      claiming that in this case the thirty days provided

16      for the Rule 1.350 expires after the scheduled

17      deposition and after the trial date.

18           This was sent out on the 31st of October by

19      Vanessa Sloat-Rogers apparently not aware or not

20      talking to somebody -- to Mr. Barsky -- that there

21      is a specific order allowing this to happen.

22           So, Mr. Barsky, as you can tell, I am not at

23      all pleased by having to jump through these

24      procedural hurdles which we shouldn't have to be

25      jumping through.  Can you explain to me what is

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    going on in this case?

2         MR. BARSKY:  We -- we produced the trial -- the

3    witness -- I'm sorry.  We produced the witness for

4    deposition on the 4th, which was within the

5    timeframe.  We produced all documents that we would

6    be using at trial to opposing counsel prior to the

7    deposition.  So we complied with your order.

8         THE COURT:  Well, why are -- why are you -- why

9    is your firm filing these motions?

10        MR. BARSKY:  The motion to continue would be

11   the -- we were contacted after the docket sounding

12   or calendar call from Mr. Steele indicating that

13   there was an outstanding motion for leave to amend

14   his answer.

15        And we advised him that we would be willing to

16   agree to amend his answer if he would be willing

17   to -- to continue the trial to give us time to

18   respond to his amended answer, and he said no.

19        But since we learned -- we -- the file

20   attorney -- I guess because things were going on --

21   didn't realize that until he brought it to our

22   attention that that motion was never resolved.

23        THE COURT:  The file -- now, what does that

24   mean, the file attorney versus -- you are the trial

25   attorney versus the file attorney?  What -- I don't

1    know what's going on with your firm because it is

2    apparent to me -- and I would assume it's -- would

3    be apparent to any appellate judge who bothers to

4    review -- to review the record and/or his or her law

5    clerk who assists the appellate court in reviewing

6    the record, that people in your office are not

7    talking to each other.  I mean, they don't seem to

8    know what's going on on the file.

9        Notices are being -- notices for readiness for

10   trial are being filed, and then there are motions

11   for continuance because the case is not ready or

12   allegedly not ready.

13       And then there is an order that says you have

14   to disclose the information, et cetera, by a certain

15   date, and then there is a motion for protective

16   order which obviously doesn't contemplate  what's

17   going on previously on the -- on the order -- that

18   was done orally at docket call.

19       So I don't -- and this is not the first time it

20   happened.  I am not blaming you, Mr. Barsky.  I

21   don't -- your file management and your office

22   practice, as in your firm, to be understated, leaves

23   a lot to be desired.

24       And it seems unprofessional to me that I get

25   these motions that I -- I get them and I have to --

Atkinson-Baker Court Reporters
www.depo.com

1    I have to deal with them when they shouldn't even be

2    filed.  So I don't understand what is going on, and

3    do you want me to deal with these motions today that

4    are -- that are pending or outstanding, or have they

5    been waived or abandoned, or what are we doing?

6         MR. BARSKY:  There is an outstanding motion for

7    leave to amend.  So, technically, yes.

8         THE COURT:  Well, there is a motion for

9    protective order.  Are you withdrawing that motion?

10        MR. BARSKY:  I withdraw the motion for

11   protective order.  We complied with it.

12        THE COURT:  Okay.  Now, your motion for

13   continuance, I assume -- Mr. Steele, are you asking

14   for a continuance today?

15        MR. STEELE:  No, Your Honor.

16        THE COURT:  Okay.  And you are standing on the

17   previous answer?

18        MR. STEELE:  Yes.  I believe that it -- it -- I

19   believe that it -- it sufficiently apprised them as

20   to what our defense --

21        THE COURT:  Okay.

22        MR. STEELE:  --- was going to be.  The reason I

23   did the motion for interlineation was to provide

24   further detail, but the initial affirmative defenses

25   specifically pled in general terms how we were

11

1      defending them.  So --

2           THE COURT:  And nobody moved to strike?  There

3      was no motion to strike the answer and affirmative

4      defenses or --

5           MR. BARSKY:  He never -- go ahead.

6           MR. STEELE:  No.  And the thing that --

7           MR. BARSKY:  He never set it for hearing.  So

8      it was never --

9           MR. STEELE:  No, that's not --

10          MR. BARSKY:  -- so I couldn't strike it.

11          MR. STEELE:  -- that's not true.  We did set it

12      for hearing.

13          THE COURT:  Oh, yes, you did.

14          MR. STEELE:  Yeah.  And I cancelled it --

15          THE COURT:  It was set for hearing --

16          MR. STEELE:  -- shortly before because my

17      recollection was that I got an agreement from the

18      attorney who was handling it at that time, whose

19      name was Natalie Knight-Tai, that she was in

20      agreement with my motion to amend by interlineation.

21          And, apparently, there was never an order

22      entered -- an agreed order submitted regarding that.

23      But, regardless, I still feel that they have been

24      put on notice that that's what the defense was.

25          The only thing was that it was fleshed-out in

1   greater detail in the motion to amend by

2   interlineation.

3        But we still had alleged this underlying issue

4   that the reason that my client is not in default is

5   because he got this loan modification which once

6   Nationstar took over the servicing that they failed

7   to honor.

8        THE COURT:  Okay.  So, the bottom line is, you

9   didn't file the motion to continue and there wasn't

10   an agreed order --

11        MR. STEELE:  No, no.

12        THE COURT:  Right.  When I -- when I see the

13   plaintiff filing a motion for continuance based on a

14   defendant's motion that allegedly hasn't been heard

15   that makes me nervous.

16        Now, I have the notice -- the notice -- the

17   motion to amend was actually set for a hearing on --

18   I spent a lot of time on this -- it was actually set

19   for hearing on January 20th and it was cancelled by

20   Mr. Steele on January 25th, and then it was again

21   noticed for hearing and it was cancelled by

22   Ms. Knight-Tai.

23        So, the bottom line is, there is no pending

24   motion.  If there was, it would be -- if it is

25   pending, it is denied.  Are we ready to go forward?

13

Atkinson-Baker Court Reporters
www.depo.com

1          MR. BARSKY:  Yes, Your Honor.

2          THE COURT:  Okay.  Any preliminary matters

3     which need to be heard by the Court prior to our

4     starting the trial today?

5          MR. STEELE:  Just as a -- as a housekeeping

6     matter, as you can see, my -- my client is -- is in

7     a wheelchair.  He is one hundred percent disabled

8     and is -- has gout and also has severe pain from a

9     surgery -- a service-related surgery that he had.

10          So I asked Mr. Barsky if we could take my

11     client out of turn so that he could get in, offer

12     his testimony, and -- and leave because I don't know

13     that he can sit through, you know, hours of --

14     and -- and Mr. Barsky agreed to that to let him --

15     to testify out of turn.

16          THE COURT:  Is that all right with Mr. Barsky?

17          MR. BARSKY:  That's fine, Your Honor.

18          THE COURT:  And my comments earlier about

19     professionalism have nothing to do with you because

20     you are a very professional attorney, but I am

21     concerned with some of the things I am seeing not

22     having to do with you.

23          MR. BARSKY:  Thank you, Your Honor.

24          THE COURT:  But that's for the record so that

25     it is clear on that.  Okay.  Let's do opening

14

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    statements and then -- unless you want to waive.

2         MR. BARSKY:  I will waive opening statement.

3         THE COURT:  Waive, reserve?

4         MR. STEELE:  If -- I would like to, if I could,

5    go ahead and -- I think it would help.

6         THE COURT:  Well, then Mr. Barsky maybe wants

7    to do his opening then, or do you just want to --

8         MR. BARSKY:  I will waive my opening.

9         THE COURT:  You will stand on your pleadings?

10        MR. BARSKY:  Yes.

11        THE COURT:  Okay.  All right.  Mr. Steele.

12        MR. STEELE:  Yes, Your Honor.  As I have

13   indicated, I represent Joseph Akowskey, who

14   originally signed a loan with Bank of America

15   back -- I think it was in 2005.

16        And he ran into some problems with the loan,

17   and in 2012 -- May of 2012 -- he was sent a letter

18   from a representative of Bank of America saying that

19   they had this program called pre-suit mediation.

20        And that if he wanted to do that, provided he

21   sent in all of his paperwork, that they would be

22   willing to meet him at the call-in center with an

23   attorney and a representative from the bank and try

24   to work something out with him.

25        And, in fact, on August the 14th of 2012, a

Atkinson-Baker Court Reporters
www.depo.com

1    mediation occurred at the call-in center with a

2    representative of the bank there and an attorney

3    representing the bank and Mr. Akowskey.

4        And Mr. Akowskey, when the letter was sent to

5    him was told it was only addressed to him, and it

6    said -- you know, so he was the only one who showed

7    up, even though his wife was also on the note.

8        The mediation revealed that a settlement had

9    been reached, and Mr. Akowskey was given a letter at

10   that point that said, "To accept this offer you must

11   make your first monthly trial period payment under

12   your trial period plan described below.  To qualify

13   for the permanent modification, you must make the

14   following trial period payments in a timely manner

15   as described below instead of your normal monthly

16   mortgage payments.  After all trial period payments

17   are timely made, your mortgage will be permanently

18   modified."

19       And Mr. Akowskey asked, does my wife need to do

20   anything, and they said, nope.  The only thing that

21   you need to do is to make sure that you get us those

22   three payments, and when we modify the mortgage we

23   are going to put it so that it's just in your wife's

24   (sic) name, because they were having some marital

25   difficulties and that point, and Mr. Akowskey only

Trial
November 16, 2016

1    wanted the mortgage in his name.

2        So Mr. Akowskey timely made the next three

3    payments.  After -- shortly after that, he got a

4    letter from them saying your loan has been

5    permanently modified and your new payment, instead

6    of being for the three trial payments, which was

7    $790 a month, will now be $751 a month.

8        And for the next ten months he made -- or nine

9    months, I'm sorry -- no, ten months -- he made those

10   payments to Bank of America.  And Bank of America

11   accepted each and every one of those payments.

12       So -- and then after Mr. Akowskey had made 13

13   payments to Bank of America in accordance with the

14   terms of his loan modification that he entered into

15   back in August of 2012, his loan got service

16   transferred to Nationstar.

17       He then attempted to make a payment, his first

18   payment to Nationstar, and they said, well, we can't

19   take that; that's not a full payment.  And he said,

20   but I have this modification, and they went back and

21   forth and back and forth.

22       And eventually Nationstar told Mr. Akowskey,

23   we're sorry, we can't accept the modification

24   because your wife never signed it.  To which

25   Mr. Akowskey said, but my wife was never required to

1    sign it, and I made all these payments.  I made 13

2    payments to Bank of America, and they never

3    mentioned anything to me about this issue.  And

4    thereupon Nationstar refused to accept any of his

5    payments and filed suit against him shortly

6    thereafter and that's where we are today.

7        And then, I think about a year after they filed

8    suit, Nationstar sent back the 13 payments that --

9    that he had paid previously to Bank of America, I

10   guess in an after-the-fact effort to negate the

11   deal.  So in our opinion, you know, my client had an

12   enforceable loan modification agreement.

13       I think there are a couple of cases that are

14   directly on point that have actually just come out

15   recently, and I think this is probably going to be a

16   continuing problem.

17       One is Nolan v. Nationstar, and one is

18   Kuehlman v. Bank of America.  And in both of those

19   cases, the parties entered into a loan modification

20   and the case was service transferred -- the file was

21   service transferred, and the new servicer decided

22   not to accept it.  And the court said, sorry, you

23   know, they said -- you know, the other party signed

24   the agreement and you accepted the -- the payments.

25       Now, in the one case, which I think is probably

1    the most directly on point, the Kuehlman case, in

2    that case the -- the borrower did not send in the --

3    the loan modification agreement timely and the

4    borrower -- the first six payments that the borrower

5    sent in were all late.

6         Nevertheless, the court said you had been

7    accepting these payments and remained silent about

8    them.  And, even though he didn't comply with the

9    terms of it and even though he didn't return the

10   agreement timely, you accepted nine payments from

11   him -- in this case, they accepted 13 -- and you

12   have yourself a deal whether you like it or not and

13   that the loan modification is enforceable because

14   all you told him that he had to do was to mail in

15   the agreement and send in the payments, which he

16   did.  So -- so he complied fully with the -- with

17   the offer.

18        So for that reason we believe that my client

19   did not default under the terms of the -- of the --

20   of the loan modification agreement, and we will be

21   asking for a dismissal at the close of -- of the

22   plaintiff's case.

23        THE COURT:  Mr. Steele, have -- have you had a

24   chance to review today's opinions out of the Fourth

25   DCA?

19

```
 1              MR. STEELE:  Not today's, no, Your Honor.

 2              THE COURT:  Mr. Barsky?

 3              MR. BARSKY:  No.  I have not, no.

 4              THE COURT:  Well, I am going to hand you a case

 5      known as Bank of New York Mellon v. Withum,

 6      W-i-t-h-u-m, and I am going to ask you to take a

 7      look at it and see if that has anything -- any

 8      impact on what you are planning on doing here today.

 9              MR. STEELE:  Okay.

10              THE COURT:  It sounded like it might have some

11      sort of implication.  Okay.  So I don't know whether

12      it applies here or not, but it sounded like it might

13      have some sort of an implication.  So you will need

14      to be aware of the case.

15              MR. STEELE:  Would you -- do you -- do you have

16      a copy of the Nolan or the Kuehlman decision?

17              THE COURT:  Not with me, no.

18              MR. STEELE:  If I could, I will provide you

19      with a copy and opposing counsel with a copy.

20              THE COURT:  Is there any material issue --

21      genuine issue of material fact regarding whether or

22      not there was at least one acceleration letter that

23      was sent out and received?

24              MR. STEELE:  Yes, there is --

25              THE COURT:  Oh, okay.
```

20

```
1              MR. STEELE:  -- which is an additional issue.
2              THE COURT:  All right.  We can come up and
3        have -- is it Akowskey?  Am I saying your name
4        right, sir?
5              MR. AKOWSKEY:  Yes sir.
6              THE COURT:  Mr. Akowskey, if you will come up
7        here to the witness stand, and we are going to put
8        you right here at the edge -- at the end of the --
9        at the end of the witness stand or the jury box.
10             All right.  If you would be kind enough to
11       raise your right hand, I will swear you in.  Do you
12       solemnly swear or affirm that the testimony you are
13       about to give will be the truth, the whole truth,
14       and nothing but the truth, so help you God?
15             MR. AKOWSKEY:  Yes, Your Honor.
16             THE COURT:  All right, thanks.  So who wants to
17       go first, Mr. Steele?
18             MR. STEELE:  We will try to get you -- I know
19       you are in some discomfort here -- we will try to
20       get you in and out as -- as soon as possible.
21  Thereupon:
22                     JOSEPH AKOWSKEY
23  was called as a witness and, having first been duly
24  sworn, testified as follows:
25                     DIRECT EXAMINATION
```

```
 1   BY MR. STEELE:
 2       Q.   If you could state your full name for the
 3   record, please, and your address.
 4       A.   Joseph Peter Akowskey, 1062 SW Coleman Avenue,
 5   Port St. Lucie, Florida 34953.
 6       Q.   And just for the -- so the record is clear for
 7   anybody that might just be reading this.  You are in a
 8   wheelchair.  Can you tell us why that is?
 9            MR. BARSKY:  Objection, relevance.
10            THE COURT:  What -- what is the relevance of
11       his being disabled.
12            MR. STEELE:  I just -- I suppose there -- there
13       isn't.  I just wanted to -- in case -- I don't know
14       whether she is getting the noise -- I mean, the
15       noises that he is making.  I mean, he is not able
16       to -- he wanted to me apologize in advance if he has
17       to --
18            THE COURT:  No, that's fine.
19            MR. STEELE:   -- make -- make that -- those
20       noises, but I just wanted to -- it just to be
21       reflected on the record of why it might be
22       necessary -- why he -- why it's necessary for him to
23       make those.  All right.  Well --
24            THE COURT:  Sustained.
25   BY MR. STEELE:
```

22

1        Q.    Did you and your wife back in June of 2009 take

2    out a $108,600 loan with Bank of America?

3        A.    Yes.

4        Q.    And did you make payments to Bank of America on

5    that loan for the next six years?

6        A.    Yes.

7        Q.    And did there come a time when you were

8    notified by Bank of America that they could help you

9    with your loan?

10       A.    Yes.  I wanted to bring the interest rate down

11   to -- I think it was .34, and I wanted to lower it more,

12   and then it went to .2.  So I kept watching the interest

13   rate in order to take advantage of the modifications

14   that they were offering at that time.

15       Q.    Did you receive a letter from someone advising

16   you of -- of Bank of America's pre-suit mediation

17   program?

18       A.    Yes.

19            MR. STEELE:  I would like to show you what I

20       would like to have marked as Defendant's Exhibit 1.

21            (Defendant's Exhibit 1 was marked for

22       identification.)

23   BY MR. STEELE:

24       Q.    I would like you to take a look what I have had

25   marked as Plaintiff's (sic) Exhibit 1 for identification

```
 1    purposes and ask you if that is the letter that you

 2    received from or on behalf of Bank of America about

 3    their pre-suit mediation program?

 4         A.   Yeah, it looks like it.

 5              MR. STEELE:  I would like to move this into

 6         evidence as Defendant's Exhibit 1.

 7              THE COURT:  Any legal objection?

 8              MR. BARSKY:  Objection, hearsay.

 9              THE COURT:  It's a document from your client;

10         isn't it?

11              MR. BARSKY:  The prior servicer --

12              THE COURT:  And your response would be --

13              MR. BARSKY:  It's not my client.  It's the

14         prior servicer.  It's from Bank of America.

15              THE COURT:  To the person entitled -- it's a

16         document from the person --

17              MR. STEELE:  Yes.

18              THE COURT: -- to persons entitled.  Okay.

19         Well, it's -- at a minimum, it's an admission

20         against interest.

21              MR. BARSKY:  Actually, it is a letter, Your

22         Honor, from the in-charge housing counsel, and I

23         don't know who they are.

24              THE COURT:  How is that not an admission

25         against interest?  The objection is overruled.  It
```

24

Atkinson-Baker Court Reporters
www.depo.com

1    will be introduced into evidence as Plaintiff's --

2    Defendant's 1.

3         (Defendant's Exhibit 1 was admitted into

4    evidence.)

5         THE COURT:  I need to stop here for just a

6    minute.  I have got -- due to my extensive review of

7    the court file prior to coming to trial, I have -- I

8    have an answer and affirmative defenses filed by

9    Mr. Steele on -- e-filed 4/14/2015.  I have an --

10   I'm sorry, I have an answer filed 4/14/2015 with

11   affirmative defenses.

12        Then I have a 6/18/2015 answer and affirmative

13   defenses filed by Mr. Steele.  So I assume -- and

14   assumptions are dangerous things -- that we are

15   proceeding under the -- the one filed last in time?

16        MR. STEELE:  Would it be possible for me to

17   take a look at the one from --

18        THE COURT:  Here you go.

19        MR. STEELE:  -- the -- the June one.

20        THE COURT:  Mr. Barsky, you can look at them

21   too.  By the way, I don't see Ms. Akowskey here.

22        MR. BARSKY:  We have a consent with them, Your

23   Honor.

24        THE COURT:  Okay.

25        MR. STEELE:  We both have the one from the

25

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1     14th.  I don't know why I don't have -- neither one

2     of us have the one from the -- from the -- from

3     2015.  I think what --

4          MR. BARSKY:  The are both from 2015; one is

5     from April and one is from June.

6          MR. STEELE:  Right.  We both have the April

7     one.  I think what happened was, is that there was a

8     motion to strike certain of my affirmative defenses,

9     and I think that this was the answer with those

10    affirmative defenses stricken and taken out.  It's

11    the only thing I can think of as to why this was in

12    there.  I do remember that there was a motion to

13    strike certain of the --

14         MR. BARSKY:  Yeah.

15         MR. STEELE:  -- affirmative defenses.

16         THE COURT:  It's separately filed.

17         MR. STEELE:  Right.

18         MR. BARSKY:  My recollection was that there was

19    no hearing on that, and maybe you just did it on

20    your own.

21         MR. STEELE:  Well, we had an agreed order --

22    maybe we had an agreed order on it; that's the only

23    thing that I can think of.  I mean, the -- the --

24    the applicable affirmative defenses --

25         MR. BARSKY:  It should be the --

26

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
1           MR. STEELE:  -- are basically the -- the first
2     and the -- the seventh are the two that I am
3     primarily relying upon.
4           MR. BARSKY:  Yeah.
5           MR. STEELE:  So, to me, either one is fine.
6           MR. BARSKY:  If they are the same, then either
7     one would be fine.
8           MR. STEELE:  Yeah.
9           MR. BARSKY:  I -- I thought those were the two
10    that you would be relying upon.
11          MR. STEELE:  Right.
12          THE COURT:  Okay.  So you are primarily relying
13    on one and what?
14          MR. STEELE:  Seven.
15          MR. BARSKY:  Seven.
16          THE COURT:  Okay.  And nobody can fault me for
17    being inattentive; all right, one and seven.
18  BY MR. STEELE:
19    Q.   Subsequent to receiving the notification from
20  this company advising you about Bank of America's
21  pre-suit mediation, did you receive subsequent
22  communications from Bank of America asking about
23  paperwork that they needed prior to the mediation?
24    A.   Yeah.  Prior to mediation, Bank of America had
25  me go to a class, and in that class I submitted all of
```

27

Trial
November 16, 2016

```
 1    my financial, you know, several times, and they kept
 2    losing it, you know.  But I -- I did everything they
 3    told me to do --
 4        Q.   All right.
 5        A.   -- as far up to that point.
 6            MR. STEELE:  I would like to have this marked
 7        as Plaintiff's Exhibit -- or Defendant's Exhibit 2.
 8            (Defendant's Exhibit 2 was marked for
 9        identification.)
10    BY MR. STEELE:
11        Q.   I would like to show you what's been marked as
12    Defendant's Exhibit 2 and ask you if that is the letter
13    that you received from Bank of America confirming the
14    participation in the -- in the mediation and asking you
15    for certain paperwork?
16        A.   Right, that's it.
17            MR. STEELE:  All right.  I would like to have
18        this moved into evidence as Defendant's Exhibit 2.
19            THE COURT:  Same objection?
20            MR. BARSKY:  Same objection, Your Honor.
21            THE COURT:  And your response would be?
22            MR. STEELE:  It's from -- this one is from Bank
23        of America.  I mean, I don't know --
24            THE COURT:  What's your exception to the
25        hearsay rule?
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1              MR. STEELE:  Well, I mean, it's -- it's -- it's
 2        an admission against interest.  It's from them.
 3              THE COURT:  Okay.  It is.  The objection is
 4        overruled.  It will be admitted into evidence as
 5        Plaintiff's 2 -- Defendant's 2.
 6              (Defendant's Exhibit 2 was admitted into
 7        evidence.)
 8   BY MR. STEELE:
 9        Q.  Do you recall going to a mediation on August
10   the 14th of 2012?
11        A.  Yeah.  Is that -- is that prior to -- to them
12   giving me the modification?
13        Q.  This was the mediation where you met with -- at
14   the call-in center that I am talking about?
15        A.  Yes.
16        Q.  Do you recall going in the call-in center on
17   August the 4th (sic) of 2012?
18        A.  Yes.  And they told me that my wife didn't have
19   to be on the note then.
20              MR. BARSKY:  Objection, hearsay, Your Honor.
21              THE WITNESS:  They told me the modification --
22              THE COURT:  Hold on -- hold on.  Sir, hold on.
23        The objection is hearsay, and your response is?
24              MR. STEELE:  Again, it's -- it's an admission
25        by a party.  I mean, they are --
```

29

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1            THE COURT:  Overruled.  Admissions by party

 2        opponents are exceptions to the hearsay rule.

 3  BY MR. STEELE:

 4        Q.   And to your knowledge was there a mediator or

 5  person who oversaw the proceedings that was there named

 6  Philip -- Philip Newcomb (phonetic)?

 7        A.   Uh-huh, yes.

 8        Q.   And was there a representative from Bank of

 9  America by the name of Dennis Castellanos (phonetic) who

10  appeared by phone?

11            MR. BARSKY:  Objection.  I am going to --

12            THE WITNESS:  Yes.

13            MR. BARSKY:  Your Honor, I am going to object

14        to this.  These are mediation -- these are

15        private --

16            THE COURT:  Settlement negotiations.

17            MR. BARSKY:  -- settlement negotiations and --

18            THE COURT:  How is that -- you can't use

19        settlement negotiations to prove liability or a

20        material issue in -- in a case.

21            MR. STEELE:  I can certainly use it to enforce

22        the terms of the mediated agreement.  I mean, there

23        was an agreement that was reached.  I mean,

24        otherwise, how can you enforce the -- I mean, you

25        can always introduce the -- the results of a
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
1        settlement agreement --
2             THE COURT:  And where --
3             MR. STEELE:  -- to enforce them.  I mean --
4             THE COURT:  Where have you plead --
5             MR. STEELE:  -- that -- that gets waived --
6             THE COURT:  -- where have you plead --
7             MR. STEELE:  -- at that point.
8             THE COURT:  Where have you plead that there is
9        an -- there is a mediated agreement that takes it
10       out of the foreclosure.
11            THE WITNESS:  It is --
12            MR. STEELE:  Absolutely.
13            THE COURT:  Where have you -- where have you
14       plead that?
15            MR. STEELE:  In Paragraph 8, I said that they
16       refused to comply with the terms of a loan
17       modification agreement.
18            MR. BARSKY:  Affirmative defense 8?
19            MR. STEELE:  I think it's the eighth
20       affirmative defense.
21            MR. BARSKY:  I think it is the seventh.
22            MR. STEELE:  Seventh, I'm sorry.
23            THE COURT:  "The plaintiff comes to Court with
24       unclean hands and is prohibited by reason thereof
25       from obtaining the equitable relief of foreclosure
```

31

Trial
November 16, 2016

1    from this Court.  Plaintiff's unclean hands results

2    from the plaintiff's improvident and predatory and

3    intentional failure to comply with the material

4    terms of the mortgage and the note.

5         "The failure to comply with the default loan

6    servicing requirements that apply to this loan, the

7    production of certain false and fraudulent documents

8    and/or representations made to the defendant that

9    they needed to stop making mortgage payments for

10   three months to be eligible for a loan modification.

11   The plaintiff's filing of this -- filing of this

12   action after defendant accepted and acted upon

13   plaintiff's offer of a loan modification."

14        So this testimony goes to the -- this goes to

15   the issue of whether or not there was a loan

16   modification?

17        MR. STEELE:  Yes, Your Honor.

18        THE COURT:  And you are asking him what, again?

19        MR. STEELE:  I am asking him who the parties

20   were that were present when this -- when this

21   settlement agreement was signed -- who were the

22   parties that were present and signed it.

23        THE COURT:  In 94 --

24        MR. BARSKY:  The document speaks for itself,

25   Your Honor.

32

Atkinson-Baker Court Reporters
www.depo.com

```
 1            THE COURT:  Hold on.  In 90.408 -- 90.408 says,
 2       "Compromise and offers to compromise, evidence of an
 3       offer to compromise a claim which was disputed as to
 4       validity or amount, as well as any relevant conduct
 5       or statements made in negotiations concerning a
 6       compromise is -- is inadmissible to prove liability
 7       or absence of liability for the claim or its value."
 8            So the claim or it's value here is the mortgage
 9       foreclosure.  You filed an affirmative defense
10       stating that even if what the plaintiff says is
11       true, your defense defeats their claim and you have
12       to prove that by a preponderance of the evidence.
13            MR. STEELE:  Yes, Your Honor.  And the only way
14       that I can do that is by introducing the agreement
15       that was reached at this mediation that modified the
16       terms of the agreement.
17            THE COURT:  And, Mr. Barsky, he is not using it
18       to prove liability or absence of liability for the
19       claim.
20            MR. BARSKY:  I think the document would -- he
21       is going through the mediation process and who was
22       there.  I mean, if he wants to introduce the --
23       the -- the result, Your Honor, that might be
24       different than going through the whole procedure.
25            THE COURT:  Well, that's a good point.
```

33

Trial
November 16, 2016

1          MR. STEELE:  That's fine with me.

2          THE COURT:  Okay.  The objection --

3          MR. STEELE:  It may save some time.  I did --

4          THE COURT:  The objection is sustained as to

5     who was there, et cetera.  If there was a compromise

6     agreement, which is part of the affirmative defense,

7     you are entitled to -- to use -- to introduce that.

8          MR. STEELE:  I would like to show you -- what I

9     would like to have marked as Defendant's Exhibit 3.

10          (Defendant's Exhibit 3 was marked for

11     identification.)

12  BY MR. STEELE:

13     Q.   I would like to show you what I have had marked

14  as Defendant's Exhibit 3 and ask you if this is the

15  paperwork that you and the other party signed at the --

16  at the mediation concerning the terms of your

17  modification?

18     A.   Yeah, that's it; that's it.

19          MR. STEELE:  I would like to have this

20     introduced as Defendant's Exhibit 3.

21          THE COURT:  No objection?

22          MR. BARSKY:  No, Your Honor.

23          THE COURT:  No, okay.  Without objection,  it

24     will be introduced into evidence as Defendant's 3.

25          (Defendant's Exhibit 3 was admitted into

Trial
November 16, 2016

1    evidence.)

2    BY MR. STEELE:

3        Q.    In accordance with the terms of that settlement

4    agreement, did you begin making payments at a lesser

5    rate than what you had been making previously?

6        A.    Yes.

7        Q.    And, to your knowledge, was there a trial

8    period involved where you had to make a certain number

9    of payments in order for the modification to become

10   permanent?

11       A.    Well, in order to qualify for the modification,

12   they told me to stop making payments for several months,

13   and I did in order to qualify.  The bank told me that.

14       Q.    Yes.

15       A.    Okay.  And then the agreement was made with the

16   amount of what I had to pay, and then I did that

17   accordingly.

18       Q.    And, according to the agreement that's been

19   introduced as Plaintiff's (sic) Exhibit 3, it says that

20   you must make your first monthly trial period payment

21   under your trial period plan of -- in the amount of

22   $790.31 by September 1st of 2012.  Did you make that

23   payment?

24       A.    Yes.

25       Q.    And it says that to qualify for the permanent

1   modification, you must make the following trial period

2   payments in a timely manner as spec -- specified in the

3   trial period plan below instead of your normal monthly

4   mortgage payments.  Did you make your second payment in

5   the amount of $790.31 by October 1st of 2012?

6       A.   Yes, all of them.

7       Q.   Did you -- did you make your third payment of

8   $790.31 by November 1st of 2012?

9       A.   Yes.

10      Q.   Was it your understanding at that point that

11  your loan was permanently modified?

12      A.   Yeah.  They kept telling me, don't worry about

13  it.

14           MR. BARSKY:  Objection, hearsay.

15           THE WITNESS:  The -- the supervisor --

16           THE COURT:  I'm sorry?

17           THE WITNESS:  They told me --

18           MR. BARSKY:  Hearsay.

19           THE COURT:  Well, stop, sir.  When there is an

20      objection, you need to stop talking, please.  Go

21      ahead.

22           MR. BARSKY:  He said that -- he was referring

23      to what he was told by Bank of America and it --

24           THE COURT:  Which would be, what, an admission

25      by a party opponent and non-hearsay?  The objection

1    is overruled.  Okay.  You can tell me, sir, what

2    they were -- they told you.

3         THE WITNESS:  I -- I digitally kept in contact

4    with them almost on a daily basis.  And their --

5    their representative, you know, told me to make --

6    to call in and make the payments.  You know, to call

7    her and tell her I am making a payment, and I

8    transacted over the Internet with my bank.

9         THE COURT:  Okay.

10        THE WITNESS:  And the payments were made that

11   way.  So I did everything that I was advised to do

12   by them by cooperating one hundred percent.

13        THE COURT:  All right.  Thank you, sir.

14        THE WITNESS:  And then all of a sudden they

15   just stopped.  They wouldn't -- they would just

16   refuse me submitting the payments to them anymore,

17   and they just said, no, we ain't taking your payment

18   anymore.

19        THE COURT:  Okay.

20        MR. STEELE:  And -- and we will get to that in

21   a minute.

22   BY MR. STEELE:

23   Q.   So after you made the three payments, did you

24   continue making monthly payments of $790.31 for the next

25   couple of months?

```
 1        A.    Yes.

 2        Q.    Did you get a letter from Bank of America

 3   confirming that your loan was, in fact, permanently

 4   modified --

 5        A.    Yes.

 6        Q.    -- in this case?

 7        A.    Yes.

 8             MR. STEELE:  I would like to show you what I

 9        would like to have marked as Defendant's Exhibit 4.

10             (Defendant's Exhibit 4 was marked for

11   identification.)

12   BY MR. STEELE:

13        Q.    And is this the letter that you received from

14   Bank of America?  It looks like a notice date of

15   January 12th of 2013 confirming that your loan was, in

16   fact, permanently modified and that your payments now

17   would be instead of the seven -- whatever it was -- they

18   were now going to be 755.21.

19        A.    Correct, yup.

20        Q.    Okay.

21        A.    Actually, it was a lot lower; yeah.

22             MR. STEELE:  I would like to have this moved

23        into evidence as Defendant's Exhibit 4.

24             THE COURT:  Same objection?

25             MR. BARSKY:  Objection, hearsay, Your Honor.
```

Trial
November 16, 2016

```
 1            THE COURT:  Overruled.  It will be introduced
 2       as Defendant's 4.
 3            (Defendant's Exhibit 4 was admitted into
 4       evidence.)
 5  BY MR. STEELE:
 6       Q.   After you received the notification that your
 7  payments were reduced down to the 755 and change number,
 8  did you proceed to make payments to Bank of America in
 9  that amount for the next eight months?
10       A.   Yes, sir.
11       Q.   And did Bank of America accept all of your
12  payments?
13       A.   Yes, they did.
14       Q.   Did they ever notify you that the payments were
15  short or that there was a problem with the payments
16  during the time that you were with Bank of America?
17       A.   No.
18       Q.   And did there come a time at the end of 2013
19  after you had made 13 payments to Bank of America that
20  your loan was transferred to Nationstar?
21       A.   Yeah.  Yes, sir.
22       Q.   And what happened then?
23       A.   That's when I started having problems.
24       Q.   What kind of problems?
25       A.   They refused to take the payment.
```

Trial
November 16, 2016

 1        Q.    And why was that?

 2        A.    They just -- you see, people don't know that

 3    the one entity, Bank of America, owns, okay.  So it's

 4    like a sister company.  It's like a collection

 5    department, Your Honor.  It's -- it's --

 6            MR. BARSKY:  Objection, Your Honor.

 7            THE WITNESS:  -- really disturbing.

 8            THE COURT:  It would be -- the objection?

 9            MR. BARSKY:  I don't -- it's speculative.  I

10        don't think he -- he could testify that -- that

11        Nationstar is a subsidy of --

12            THE COURT:  What is your specific --

13            THE WITNESS:  Bank of America --

14            THE COURT:  -- specific legal --

15            THE WITNESS:  -- I was told that by their own

16        representative.

17            THE COURT:  When I -- here is the deal.  This

18        is how this works.  I have to control the courtroom

19        because that's my job.  When I am talking, nobody

20        else should be talking, okay.  So, Mr. Akowskey,

21        when I am talking, please stop talking, okay?  Do we

22        have that agreement today, sir?

23            THE WITNESS:  I'm sorry, sir.

24            THE COURT:  That's okay.  I just want to make

25        sure that we understand the parameters here.  Your

```
 1        specific legal -- legal objection, Mr. Barsky is?

 2             MR. BARSKY:  Competency and speculation.

 3             THE COURT:  Competency and speculation.

 4             MR. BARSKY:  Competency.

 5             THE COURT:  And your response, Mr. Steele?

 6             MR. STEELE:  I will -- I will withdraw the

 7        question and rephrase it.

 8             THE COURT:  Thanks.

 9   BY MR. STEELE:

10        Q.   What was the specific reason why Nationstar

11   told you that they could not accept your payments once

12   they started servicing the loan?

13             MR. BARSKY:  Objection, hearsay.

14             THE COURT:  And your response is?

15             MR. STEELE:  It's the same as before.  It's an

16        admission by a party.

17             THE COURT:  Overruled.

18             THE WITNESS:  They -- may I say something?

19             MR. STEELE:  Yes.

20             THE WITNESS:  They just told me they weren't

21        going to honor the -- the note anymore and that was

22        it.  And then they refused to take my phone calls.

23   BY MR. STEELE:

24        Q.   Did they -- did they ever say anything to you

25   about the need for your wife to sign the modification
```

41

Trial
November 16, 2016

1    agreement?

2        A.   No.   The whole modification when -- when I got

3    it was strictly in my name only.   That was the -- that

4    was the agreement, you know, because my wife abandoned

5    me when I was in the hospital, and so I was carrying on

6    to have the house, you know, to have the modification,

7    you know, to go through, you know, which was planned on

8    happening anyway.

9        Q.   At some point did you tell -- did -- did you --

10   before this case went -- before you got served with the

11   lawsuit in this case, did you hire my office to assist

12   you when you started having problems with Nationstar in

13   the servicing of the loan?

14       A.   Yes, sir.

15       Q.   And did you tell Nationstar to stop contacting

16   you and to address their correspondence to me, your

17   lawyer?

18           MR. BARSKY:   Objection, Your Honor.   I don't

19       think there is a counter-claim for a CP violation of

20       the Fair Debt Collection Practices Act.

21           MR. STEELE:   There is none.   There is none.

22           THE COURT:   So your specific legal objection is

23       relevance?

24           MR. BARSKY:   Relevancy.

25           THE COURT:   And the relevancy is --

42

1          MR. STEELE:  The relevancy is --

2          THE COURT:  -- you are claiming attorneys

3     fees --

4          MR. STEELE:  -- it has -- has to do with where

5     they sent the notice of intent to accelerate.

6          THE COURT:  The objection is overruled.

7          MR. STEELE:  Yes.

8          THE WITNESS:  Okay.  They kept calling my house

9     and trying to, you know, correspond with me and that

10    their attorney -- or their paralegal department, and

11    I kept telling them I have a representative.  I am

12    not allowed to talk to you, but, you know, they

13    kept -- you know, they kept on.

14  BY MR. STEELE:

15    Q.   And did you provide them with my phone number

16  and my address?

17    A.   Several times.

18    Q.   And at one point did you advise them back -- I

19  think it was in July of 2014 -- that you were about to

20  go into the hospital and have some surgery and to please

21  stop sending correspondence to me, send it to my lawyer?

22    A.   Correct.

23    Q.   And did they indicate that they would do that?

24         MR. BARSKY:  Objection, hearsay.

25         THE COURT:  Hold on.  And your response is?

43

Atkinson-Baker Court Reporters
www.depo.com

```
 1              THE WITNESS:  Well, they actually --
 2              THE COURT:  Hold on, stop.  Mr. Steele?
 3              MR. STEELE:  Again, I think it is the same --
 4      the same basis.
 5              THE COURT:  Which would be?
 6              MR. STEELE:  It would be an admission
 7      against -- against interest.
 8              THE COURT:  Overruled.  You can answer now,
 9      sir.  Thanks.
10  BY MR. STEELE:
11      Q.  Did they indicate that they would -- that they
12  would send any further correspondence to you at -- to me
13  instead of to you?
14      A.  Well, I -- still after that I kept telling them
15  like two or three times, they still sent it to me.
16              THE COURT:  Sir, you need to answer the
17      question specifically as asked.
18              THE WITNESS:  All right.
19              THE COURT:  The question was, did they continue
20      to send them to you?
21              THE WITNESS:  Yes.
22              THE COURT:  Okay, thanks.
23  BY MR. STEELE:
24      Q.  Did they -- my question was, did they agree,
25  after you gave them my address, that they would stop
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1   doing that and they would send the correspondence to me?

2          MR. BARSKY:  Objection, hearsay, Your Honor.

3          THE COURT:  Overruled.

4          THE WITNESS:  Yes.

5          MR. STEELE:  Okay.  I don't have anything

6      further.

7          THE COURT:  Cross examination.

8          MR. BARSKY:  Hi, Mr. Akowskey.  May I have

9      Plaintiff's -- Defendant's Exhibit No. 2.

10                   CROSS-EXAMINATION

11  BY MR. BARSKY:

12     Q.   You stated that the bank advised you that you

13  were the only person that was going to be participating

14  in the -- the loan modification; is that correct?

15     A.   Yes, sir.

16     Q.   I am showing you what is marked as Plaintiff's

17  (sic) Exhibit No. 2.  Who is that addressed to?

18     A.   It doesn't matter.  They said, don't worry

19  about it.

20          THE COURT:  Sir --

21          MR. BARSKY:  Please answer my question.  Who is

22      it -- who is it addressed to?

23          THE COURT:  You need to answer the question.

24          THE WITNESS:  Both parties.

25  BY MR. BARSKY:

Atkinson-Baker Court Reporters
www.depo.com

1      Q.    You and your wife, please -- the names of the

2   parties, please?

3      A.    Joseph P. Akowskey and Pauline Akowskey.

4      Q.    Both of you; correct?

5      A.    Correct.

6            THE WITNESS:  May I say something, Your Honor?

7            MR. BARSKY:  No.

8            THE COURT:  There is not a pending question,

9      that's why you have a lawyer.

10           MR. BARSKY:  Oh, I'm sorry.  Could I see No. 2

11     again.  I'm sorry about that.  May I approach, Your

12     Honor?

13           THE COURT:  Yes, sir.  Thank you.

14   BY MR. STEELE:

15     Q.    This is the letter that you -- you said that

16   indicated about the pre -- the modification program.

17   Will you please read this sentence?

18     A.    The signature of the --

19           THE COURT:  Oh, no --

20           MR. BARSKY:  Read it slower and --

21           THE COURT:  If you could be kind -- kind enough

22     to read it where I -- I can understand it.  Thanks.

23           THE WITNESS:  The signature of each borrower

24     and the date the document was signed --

25           THE COURT:  Sir.

46

Trial
November 16, 2016

1          THE WITNESS:  I can't speak no louder, Your

2     Honor.  My -- the pain hurts.

3          THE COURT:  Well, I appreciate that, but you

4     were clear and able -- for me to understand you

5     about thirty seconds ago, and now you're not.  Is

6     there --

7          THE WITNESS:  Because it is increasing in pain,

8     Your Honor.

9          THE COURT:  Okay.  So --

10         MR. BARSKY:  Do you want to take a break?

11         THE WITNESS:  No.  I want to get this over

12    with.

13         THE COURT:  Okay.  Well, if you can -- I can't

14    understand a word you are saying when you are

15    reading that.  So if you can read it -- read it a

16    little clearer.

17         THE WITNESS:  Well, I will try it again, Your

18    Honor.  I'm sorry.

19         THE COURT:  Thanks.

20         THE WITNESS:  "The signature of each borrower

21    and the date that the document was signed is

22    required for many documents.  Please make sure that

23    all the proper signatures and dates are provided for

24    any documents listed below."

25         THE COURT:  Okay.

1    BY MR. BARSKY:

2        Q.   Okay.  So it -- it is indicating that all the

3    borrowers have to sign the documentation; is that

4    correct?

5        A.   But that's not what I was told.

6        Q.   I'm not -- I am not concerned about what you

7    are told.  I am saying -- I am saying, what does that

8    letter say?

9        A.   Oh, yeah, that's what it says here.

10       Q.   And --

11            THE COURT:  Could I see counsel up here at the

12   bench for a sidebar.

13            (At sidebar on the record:)

14            THE COURT:  Mr. Barskey, do you understand that

15       your predecessor-in-interest accepted payments?

16            MR. BARSKY:  I know.  I understand that.

17            THE COURT:  Or they said they did.

18            MR. BARSKY:  I -- I understand that, but, Your

19       Honor, our position is that the loan modification

20       was never an agreement because it was never signed

21       by the wife.

22            THE COURT:  I understand that, but they

23       accepted payments.  How is that not an acceptance of

24       the agreement?

25            MR. BARSKY:  I believe they were trying to work

Atkinson-Baker Court Reporters
www.depo.com

1          it out with them, Your Honor.

2                THE COURT:  Okay, fair enough, thanks.  We are

3          done at the sidebar.

4                (End of discussion at sidebar.)

5                MR. BARSKY:  May I see Exhibit No. 3, please.

6     BY MR. BARSKY:

7          Q.   I am showing you what has been marked as

8     Exhibit No. 3 and that was the agreement at the

9     mediation and attached to that was the trial mod;

10    correct?

11               THE CLERK:  The mediation report.

12               MR. BARSKY:  Did somebody say something?

13               THE COURT:  The Deputy Clerk said it is the

14         mediation report.

15               THE CLERK:  It is labeled the mediation report.

16               MR. BARSKY:  Yeah, what did I say?  The

17         mediation report.  I'm sorry if I --

18               THE COURT:  And that's No. 3; right?

19               MR. BARSKY:  Yes.

20               THE CLERK:  Yes.

21               THE COURT:  We were just concerned that there

22         may be something out there that we don't know about

23         that you are referring to.

24               MR. BARSKY:  No, no.

25               THE COURT:  Okay.

Trial
November 16, 2016

```
 1   BY MR. BARSKY:
 2       Q.   I am showing you the trial mod portion of that.
 3       A.   Uh-huh.
 4       Q.   Will you please read where it says, "Good
 5   news".
 6       A.   "The good news, you may be eligible for a
 7   modification ordered by Fannie Mae, the owner of your
 8   loan.  This modification" --
 9            THE COURT REPORTER:  Your Honor, I am not
10       hearing him.  Would you please speak clearer.
11            THE COURT:  If you can, sir, just a little
12       bit -- just a little bit louder.  We can take a
13       break if you like.
14            THE WITNESS:  No.
15            THE COURT:  Okay.
16            THE WITNESS:  "This modification is designed
17       for the borrower, like you, who for some reason did
18       not meet all of the eligibility criteria for a
19       permanent modification under the Government Home
20       Affordable Modification Program or were unable to
21       successfully make payments under H-A-M-P
22       modification or another modification."
23       Q.   Again, it's -- the letter was addressed to --
24   who is it addressed to?
25       A.   Joseph P. Akowskey and Pauline Akowskey.
```

50

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      Q.    So it was addressed to both parties; correct?

2      A.    Correct.

3      Q.    And it indicates that the modification was done

4    for the borrowers, plural, right?

5      A.    No.

6      Q.    It doesn't say borrowers, plural?

7      A.    You are -- you are asking me to agree with

8    something that I don't agree with.

9      Q.    I am just asking you about the letter.  Does

10   the letter say borrowers, plural?

11     A.    Well, yeah, the letter does.

12           MR. BARSKY:  And I am sorry.  I don't want to

13     badger the witness, Your Honor.

14           THE COURT:  You are certainly not doing that.

15           MR. BARSKY:  May I have Exhibit No. 4, please.

16   BY MR. BARSKY:

17     Q.    Exhibit No. 4 is this the letter that you --

18   that indicated that there was an acceptance of the trial

19   mod.  Can you please just read the top portion, starting

20   from "Thank you".

21     A.    It says, "Thank you for making your trial

22   period mortgage payments.  This certifies commitment and

23   is intended to be a clear and simple summary of the

24   final loan modification that we are pleased to offer

25   you.  The loan modification should help you put into an

51

Atkinson-Baker Court Reporters
www.depo.com

```
1    agreement to a new permanent loan modification.  Please
2    throughout review all of the enclosed documents --
3         Q.   Excuse me.  Can you read that again because you
4    did not read it right.
5         A.   It says, "Please throughout review all of the
6    enclosed documents."
7         Q.   You left out a sentence, after "obligation".
8              THE COURT:  How about you read it, and --
9              MR. BARSKY:  Oh, okay.
10             THE COURT:  -- ask him if that's what it says.
11   BY MR. BARSKY:
12        Q.   Does it say, "When you sign and return the
13   enclosed loan modification agreement, you are agreeing
14   to a new permanent loan modification."  Does it say
15   that?
16        A.   It says -- it says, "Please throughout review
17   all of the enclosed" --
18        Q.   Before that -- the sentence right before that.
19   Does it say, "When you sign and return the enclosed loan
20   modification agreement, you are agreeing to the new and
21   permanent loan modification"?
22        A.   That's what I said.
23        Q.   That's -- okay.  Thank you.  That's not what
24   you were reading.
25             THE COURT:  Okay.  Let's move on to the next
```

52

Trial
November 16, 2016

```
1      question.
2           MR. BARSKY:  Your Honor, I have another
3      document that wasn't produced, but I want to -- it
4      was produced by the defendant.  It's the actual
5      Fannie Mae loan modification agreement that was sent
6      to the borrower.
7           (Plaintiff's Exhibit 1 was marked for
8      identification.)
9           THE COURT:  Any legal objection?
10          MR. STEELE:  If I could just see it.
11          MR. BARSKY:  This is Plaintiff's Exhibit
12     number --
13          THE COURT:  Without objection, it will be
14     Plaintiff's 1.
15          (Plaintiff's Exhibit 1 was admitted into
16  evidence.)
17  BY MR. BARSKY:
18     Q.  I am showing you a document.  Do you recognize
19  this document?
20     A.  Yeah.
21     Q.  Is this the -- the loan modification agreement
22  that was sent to you by Bank of America?
23     A.  Well, I can't remember if it is or not.  I
24  can't remember, sir.
25     Q.  Does it indicate that it's the loan
```

```
 1    modification with regard to this on the top?
 2         A.    Yeah, that's what it says.
 3         Q.    And who does it list as the borrowers on the
 4    loan modification?
 5         A.    Bank of America, NA.
 6         Q.    The borrowers.
 7         A.    Fannie Mae -- oh, oh -- Joseph P. Akowskey and
 8    Pauline Akowskey.
 9         Q.    Both of you, you and your wife; correct?
10         A.    Yes, sir.
11         Q.    Are you divorced?
12         A.    Yes, sir.
13         Q.    You were?
14         A.    Yes.
15         Q.    When were you divorced?
16         A.    Last year.
17         Q.    You were married at the time of this agreement;
18    weren't you?
19         A.    Yes, sir.
20         Q.    I am showing you the signature line.
21         A.    I see that; that's my signature.
22         Q.    Is that your signature?
23         A.    Yes, sir.
24         Q.    Was it executed by your wife?
25         A.    Say that again.
```

54

Atkinson-Baker Court Reporters
www.depo.com

```
 1        Q.    Was it executed by Pauline Akowskey?

 2        A.    No.  I think I signed it.

 3        Q.    But she didn't.

 4        A.    I am not sure.

 5        Q.    Did the document indicate that it had to be

 6    returned prior -- it indicated it had to be signed by

 7    both borrowers?

 8        A.    No.

 9        Q.    The letter that I just read to you indicated --

10        A.    What the letter read and what I was told are

11    two different things.

12        Q.    Okay.

13        A.    They told me she didn't have to be on the note.

14    Even though --

15        Q.    She wasn't --

16        A.    -- even though she was on the deed, she didn't

17    have to be on the note because I was -- I was -- had

18    possession of the property is what I was told.

19        Q.    She signed the original note; didn't she?

20        A.    Yes, but she left.  She abandoned me.

21        Q.    I understand that, but she is still on the

22    note.  She still signed the note.  She is still

23    responsible for the debt; is that correct?

24        A.    Correct, right, yes.

25        Q.    And -- and if any of the documents that I had
```

Trial
November 16, 2016

1   shown you -- any -- any -- indicate that it was only for

2   you, this loan modification?

3        A.   That's what I was -- was --

4        Q.   I understand but --

5        A.   -- what you have shown -- what you have

6   shown --

7        Q.   Not what you were told, but what -- what I have

8   shown you --

9        A.   Right.

10       Q.   -- and these letters were done after even you

11  were spoken to by them and said that it was only

12  supposed to be you?

13       A.   Correct.

14       Q.   Correct.

15       A.   Yes, sir.

16       Q.   You also indicated that you had verbally told

17  Bank of America and Nationstar --

18       A.   Yes.

19       Q.   -- that you wanted all letters to go to the --

20  I'm sorry --

21       A.   The attorney.

22            MR. BARSKY:  And this is Plaintiff's Exhibit

23  No. 1, Your Honor.

24            (Plaintiff's Exhibit 2 was marked for

25  identification.)

56

Atkinson-Baker Court Reporters
www.depo.com

1    BY MR. BARSKY:

2        Q.    I am showing you a document.  Do you recognize

3    that that document?  Is that the original mortgage with

4    regard to this loan?

5        A.    Yeah, yeah.

6        Q.    I just wanted to show you -- I'm sorry.  Are

7    you okay?  We're almost done.  I will be done in a few

8    minutes.  I am showing you the signature.

9        A.    Yeah.

10       Q.    Is that your signature?

11       A.    Yeah, that's mine.

12            MR. BARSKY:  Your Honor, I would offer the

13       mortgage in as Plaintiff's Exhibit No. 2.

14            MR. STEELE:  No objection.

15            THE COURT:  Without objection, it will be

16       introduced into evidence as Plaintiff's 2.

17            (Plaintiff's Exhibit 2 was admitted into

18   evidence.)

19   BY MR. BARSKY:

20       Q.    I am showing you Paragraph 15 of the mortgage

21   with regards to notices.  Can you please read the first

22   sentence, please.

23       A.    Where it says, "If they are on the subject"?

24       Q.    No, no.  This is 15.  I'm sorry.

25       A.    All right, notice.  "All notices given by the

Atkinson-Baker Court Reporters
www.depo.com

1   borrower or lender in connection with the security --
2   with this security instrument must be in writing."
3       Q.   Okay.
4       A.   "Any notice by the borrower in connection with
5   this security."
6       Q.   Okay.  Did you ever provide written notice to
7   either Bank of America or to Nationstar that all
8   communications should go directly to your attorney prior
9   to the suit?
10      A.   I can't remember.  I am pretty sure, yes.
11      Q.   Do you have a copy?
12      A.   I don't have a copy.  I don't keep any records.
13           MR. BARSKY:  You don't keep any records; okay.
14   Your Honor, I have no further questions.
15           THE COURT:  Redirect -- recross.
16           MR. STEELE:  Just one question.
17                    REDIRECT EXAMINATION
18   BY MR. STEELE:
19      Q.   If I understand correctly, you and your wife
20   separated towards the end of 2013; is that correct?
21      A.   2011 -- 12.
22      Q.   Okay.  If at any time Bank of America had asked
23   you to get your wife's signature on any documents, could
24   you have done so?
25      A.   No.

58

Trial
November 16, 2016

1        MR. STEELE:  Okay.  All right.  I don't have

2   anything further.

3        THE COURT:  Any re -- re-cross or re-redirect?

4        MR. BARSKY:  No, Your Honor.

5        THE COURT:  Thank you for your help, sir.  You

6   are welcome to step down.

7        THE WITNESS:  Yes, sir, that's it?

8        THE COURT:  Yes, sir.

9        THE WITNESS:  Thank you, Your Honor.

10       MR. BARSKY:  Thank you.

11       THE COURT:  Thank you.

12       (The witness stepped down.)

13       MR. BARSKY:  May we take a break for a minute.

14       THE COURT:  We will.  We will take a break

15   until 3:00 o'clock.

16       MR. BARSKY:  Your Honor, I just have one

17   question for you.  I gave the original note -- the

18   original mortgage.  Would I be able to substitute

19   that with a copy, and then after I do the note and

20   mortgage of --

21       THE COURT:  Well, we keep the original note and

22   mortgage.  The Clerk keeps it.

23       MR. BARSKY:  Okay.  Some -- some judges --

24   because it is an exhibit they might not keep it

25   separate; that's fine.

59

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1            THE COURT:  Well, it doesn't go into evidence.
 2    You can put the copy of the note and mortgage -- we
 3    will put that in evidence.
 4            MR. BARSKY:  That's fine.
 5            THE COURT:  But we will actually file --
 6            MR. BARSKY:  Yes, Your Honor.  I just wanted to
 7    make sure of that.  Thank you.
 8            THE COURT:  Okay.  We will be in recess until
 9    3:00 o'clock.
10            (Court in recess until 3:02 p.m.)
11            THE COURT:  Do you solemnly swear or affirm
12    that the testimony you are about to give will be the
13    truth, the whole truth, and nothing but the truth,
14    so help you God?
15            MR. AZARSEPANDAN:  I do.
16            THE COURT:  Thank you, sir.  And when you get
17    comfortable or as comfortable as you can be, please
18    state your full name for the record, spelling your
19    first and last names.
20            THE WITNESS:  Yes.  My name is Ilosh
21    Azarsepandan.  It is spelled, I-l-o-s-h.  The last
22    name is spelled, A-z-a-r-s-e-p-a-n-d-a-n.
23            THE COURT:  And it is -- pronounce it
24    phonetically for me.
25            THE WITNESS:  Ilosh Azarsepandan.
```

60

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1              THE COURT:  Okay.  All right.  Thank you, sir.
 2        Whenever you are ready.
 3   Thereupon:
 4                    ILOSH AZARSEPANDAN
 5   was called as a witness and, having first been duly
 6   sworn, testified as follows:
 7                    DIRECT EXAMINATION
 8   BY MR. BARSKY:
 9        Q.    What's the name of your employer?
10        A.    Nationstar Mortgage, LLC.
11        Q.    And what is your position in that company?
12        A.    I am a default case specialist, which means I
13   review and research our business records relating to
14   mortgages we service.
15        Q.    Okay.  And what is the relationship with
16   Nationstar to the -- to the investor with regard to
17   the -- what's Nationstar's relationship to this claim?
18        A.    Nationstar is the plaintiff and the servicer in
19   this matter.
20        Q.    Okay.  And what are your responsibilities?
21        A.    I regularly review our business records
22   relating to the mortgages we service.
23        Q.    Okay.  And are you familiar with the loan
24   associated with this action?
25        A.    Yes, the Akowskey matter.
```

Trial
November 16, 2016

1      Q.   And have you had the opportunity to review the

2  business records?

3      A.   I have reviewed our business records, including

4  copies of the note, the mortgage, the assignment of

5  mortgage, power of attorney, payment histories, the

6  breach letter, the return receipt for the breach letter,

7  and documents such as those.

8      Q.   Okay.  And what did -- what -- did you receive

9  any training with Nationstar?

10     A.   Yes.  I have received training at Nationstar.

11  It's ongoing.  For example, when I was hired at

12  Nationstar, I received training for a month prior to me

13  attending any legal event such as this.

14          Periodically, I receive training, whether it is

15  online or if it is flying back to Dallas.  For example,

16  last week I was in Dallas at our headquarters receiving

17  training about certain ways of doing business for

18  servicing mortgages.  So I was there last week, and

19  every so often I do that as well.

20     Q.   And where there different departments that you

21  had trained --

22          (Brief interruption.)

23  BY MR. BARSKY:

24     Q.   Can you please go into a little bit of the

25  training that you got from maybe the different

Atkinson-Baker Court Reporters
www.depo.com

1    departments that might be helpful with regard to this

2    case and your preparation for this case.

3         A.    Some of the training I have gotten at

4    Nationstar includes training with our on-boarding area,

5    which is known as loan acquisitions.  They are the team

6    that coordinates with other departments such as the

7    payment processing area and the breach team to ensure

8    that our documents that we are receiving from other

9    parties, including prior servicers -- such as in this

10   case, Bank of America -- contain data that's accurate,

11   reliable and trustworthy and rely on it going forward.

12        I -- I have sat with that group numerous times

13   throughout my tenure at Nationstar.  I have trained with

14   other departments, such as our cash management

15   department, which handles the payment processing, as

16   well as accounts services, the -- the area that handles

17   powers of attorneys documents, and so on and so forth.

18        Q.    Is there a department that deals with, I guess,

19   payments?

20        A.    Yes.

21        Q.    And which department?

22        A.    The cash management department.

23        Q.    It is, okay, and that was the one that you

24   just --

25        A.    Yes.

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1        Q.    And you sat with them?
 2        A.    Yes.  I -- not -- not in my last -- not last
 3   week --
 4        Q.    No, no.  But, in general, since you have
 5   been --
 6        A.    -- but I have sat with them during my
 7   employment there.
 8        Q.    Okay.  And you indicated there was a prior
 9   servicer; is that correct?
10        A.    There is a prior servicer for this.
11        Q.    And who is the prior servicer?
12        A.    Bank of America, NA.
13        Q.    Okay.  And was there any relation --
14   contractual relationship between your company and the
15   prior servicer?
16        A.    In the sense -- yes -- in the sense that we
17   obtained servicing rights for this loan.
18        Q.    And is there a process when -- when records
19   come from a prior servicer to the -- to -- to your
20   company?  Is there -- what's the process called?
21        A.    It's called our on-boarding process, which I --
22   I briefly described, to verify the documents and the
23   data within them and their accuracy, reliability and
24   trustworthiness.  For example, we just don't want to
25   rely on a document that comes over, you know, like a
```

Trial
November 16, 2016

1   payment history from a prior servicer.

2           We do our own due diligence as far as

3   reamortization, and checking of figures and comparing

4   them to the note and other documents within the file --

5   mortgage -- monthly mortgage statements, those -- that

6   type of independent analysis.  And also, if necessary,

7   we -- we confer with the prior servicer if there are any

8   questions.

9       Q.   And it's only the payment history, or do they

10  have other documents also?

11      A.   All the documents and all the data that come

12  from outside sources from Nationstar, those are

13  reviewed.  It doesn't matter if it is a payment history,

14  a breach letter, the note itself and making sure we have

15  accurate copies of the note, copies of any assignments

16  or the actual original assignments.  Any document, even

17  correspondence, that comes in from an outside source is

18  reviewed and goes through this process prior to it being

19  integrated into our business records.

20      Q.   Okay.  And if there is a problem with any of

21  the documentation, what would happen?

22      A.   If there is any problem, there are different

23  options.  We can send the loan back to the prior

24  servicer and make changes to the loan with the consent

25  of all parties.  Those are the primary options.

Atkinson-Baker Court Reporters
www.depo.com

```
 1      Q.   All right.  If there was a discrepancy like

 2   within the payment history or anything, what -- you

 3   wouldn't board it into your process; would you?

 4      A.   No, because that would entail relying on

 5   incorrect data and that is not what we are in the

 6   business of.  We are a mortgage servicer.  We rely on

 7   documents and data, including figures that are very

 8   important in the servicing of the loan, and so we need

 9   to make sure they are correct before we continue to

10   service it and send out information based on the

11   information we inherited.

12      Q.   And what happens to the -- the loan -- after it

13   is done with the boarding process -- with those

14   documents?

15      A.   Those documents are imaged into our imaging

16   system, which is known as FileNet.

17      Q.   And whose records are they -- are they becoming

18   anyone else's records -- are they your records?

19      A.   They become Nationstar's business records.

20           (Plaintiff's Exhibit 3 was marked for

21      identification.)

22      Q.   I am showing you a document.  Do you recognize

23   that document?

24      A.   Yes.  This is a copy of what's known as a

25   welcome letter or a hello letter on this loan.
```

Trial
November 16, 2016

1    Q.   Okay.  Is that record kept in the regular

2  course of conducted business?

3    A.   Yes, it is.

4    Q.   Is it a record that is routinely made and kept

5  in the regular course of your usual business practice?

6    A.   Yes, it is.

7    Q.   Is it a record that's made near the time of the

8  occurrence of the matter?

9    A.   Yes.

10    Q.   And is it a record that was made by a person

11  with knowledge or from information transmitted by a

12  person with knowledge?

13    A.   Yes, it is.

14        MR. BARSKY:  Your Honor, I would offer the

15    hello letter as Plaintiff's Exhibit No. 3.

16        MR. STEELE:  No objection.

17        THE COURT:  Without objection, it will be

18    introduced into evidence as Plaintiff's 3.

19        (Plaintiff's Exhibit 3 was admitted into

20  evidence.)

21  BY MR. BARSKY:

22    Q.   What does that letter indicate -- or who is it

23  sent to?

24    A.   It is sent to the borrowers on the loan, Joseph

25  and Pauline Akowskey to the property address on file,

67

1   1062 SW Coleman Avenue, Port St. Lucie, Florida, and

2   it -- it is a document that advises the borrowers of the

3   transfer of servicing from Bank of America to

4   Nationstar, and the information on the account, the new

5   loan number, who they can contact and how they can

6   contact Nationstar, and who we are servicing the loan

7   for.

8       Q.   Okay.  And who does it say -- who does -- does

9   that letter indicate who the serv -- who the investor

10  is?

11      A.   Yes.  On the portion that includes the

12  validation of debt notice, it -- it plainly states, "We

13  look forward to servicing your loan on behalf of Fannie

14  Mae."  And it also goes on to say the creditor -- the

15  creditor to whom the debt is owed is Fannie Mae, but the

16  debt is being serviced by Nationstar.

17          MR. BARSKY:  Thank you very much.

18          (Plaintiff's Exhibit 4 was marked for

19  identification.)

20  MR. BARSKY:

21      Q.   I am showing you what's -- Plaintiff's Exhibit

22  No. 4.  Do you recognize that document?

23      A.   Yes, I do.

24      Q.   And what is that document?

25      A.   It's a limited power of attorney from

68

Atkinson-Baker Court Reporters
www.depo.com

```
 1    Fannie Mae, which -- which has the legal name of Federal
 2    National Mortgage Association conveying limited powers
 3    of attorney to Nationstar Mortgage, LLC.
 4         Q.   Okay.  Is that record kept in the regular
 5    course of conducted business activity?
 6         A.   Yes, it is.
 7         Q.   Is it a record that is one that is routinely
 8    made and kept in the course of business -- in the usual
 9    business practice?
10         A.   Yes, it is.
11         Q.   And is it made at or near the time of the
12    occurrence of the matter?
13         A.   That is correct.
14         Q.   And is it made by a person with knowledge or
15    from -- transmitted by a person with knowledge?
16         A.   That is correct, as well.
17              MR. BARSKY:  Your Honor, I would offer the
18         limited power of attorney as Plaintiff's Exhibit
19         No. 4.
20              MR. STEELE:  No objection.
21              THE COURT:  Without objection, it will be
22         introduced -- introduced into evidence as
23         Plaintiff's No. 4.
24              (Plaintiff's Exhibit 4 was admitted into
25    evidence.)
```

69

1    BY MR. BARSKY:

2        Q.    And what does that letter -- what does -- what

3    does the power of attorney -- what do you believe it

4    does?

5        A.    Since I am not an attorney, I can tell you what

6    my training and experience leads me to believe it does.

7    It gives us authority -- Nationstar, being us -- to take

8    certain actions during the course of servicing of loans

9    that we are servicing for Fannie Mae, including this

10   one.

11           MR. BARSKY:   Thank you.

12           (Plaintiff's Exhibit 5 was marked for

13   identification.)

14           MR. BARSKY:   I am showing you what is being

15       marked as Plaintiff's Exhibit No. 5 -- oh, I'm

16       sorry.

17   BY MR. BARSKY:

18       Q.    I am showing you what's marked as Plaintiff's

19   Exhibit No. 5.  Do you recognize that document?

20       A.    Yes.  This is the original note in this case.

21       Q.    Was it made at or near the time -- is it -- is

22   it a document that is regularly kept in -- in conducted

23   business activity?

24       A.    As part of our business records, yes.

25       Q.    Is it -- it is one that is routinely made and

70

```
 1    kept in the course of business or the business's usual
 2    practice?
 3         A.   Yes.
 4         Q.   And is it made at or near the time of the
 5    occurrence of the matter?
 6         A.   Yes.
 7         Q.   And is it a record made by a person with
 8    knowledge or from information transmitted by a person
 9    with knowledge?
10         A.   As part of our business records, yes.
11              MR. BARSKY:  Your Honor, I would offer the
12         original note as Plaintiff's Exhibit No. 5.
13              MR. STEELE:  No objection.
14              THE COURT:  Without objection, it will be
15         introduced into evidence as Plaintiff's 5.
16              (Plaintiff's Exhibit 5 was admitted into
17    evidence.)
18    BY MR. BARSKY:
19         Q.   And what is the date on that note?
20         A.   The date that appears on the note is June 19,
21    2009.
22         Q.   And what is the amount on the note?
23         A.   The amount is $108,600.
24         Q.   And is there a property address on the note?
25         A.   Yes.
```

Trial
November 16, 2016

1      Q.    And does it match the property address for the

2    mortgage in this case?

3      A.    Yes.

4      Q.    And was the note signed?

5      A.    Yes.   The note contains two blue-ink

6    signatures, and the names that appear below those

7    signatures are Joseph P. Akowskey and Pauline E.

8    Akowskey.

9      Q.    Who is the original lender?

10     A.    Bank of America, NA.

11     Q.    Are there any endorsements on the note?

12     A.    Yes.   There is one.   It is -- below the

13   signature lines on the signature page, and it is from

14   Bank of America, NA, and it says, "Paid to the order of"

15   and that section is blank.

16     Q.    And did plaintiff acquire their interest in the

17   note prior to filing this complaint?

18     A.    Yes.

19     Q.    And have you looked at the complaint in this

20   action?

21     A.    I have.   We have a copy of it in our business

22   records for this loan.

23     Q.    Okay.   Are you -- is there a copy of the note

24   attached to the complaint?

25     A.    Yes.

1      Q.   And is the copy of the note attached to the

2    complaint an exact copy of the -- of the original note?

3      A.   Yes.

4           MR. BARSKY:   May I have Plaintiff's Exhibit

5    No. 2; I believe it was the mortgage.

6    BY MR. BARSKY:

7      Q.   Can you tell me what Plaintiff's Exhibit

8    No. 2 -- do you recognize that document?

9      A.   Yes.   This is the mortgage or security

10   instrument that corresponds to the original note that I

11   just reviewed.

12     Q.   Okay.   And please state the name of the

13   borrower on this mortgage?

14     A.   Joseph P. Akowskey and Pauline E. Akowskey --

15     Q.   And is there a signature --

16     A.   -- husband and wife.

17     Q.   Is there a signature on the mortgage?

18     A.   Yes.   There are two blue-ink signatures above

19   the same names.

20     Q.   And is there an address on that mortgage?

21     A.   There is an address.   It is the property

22   address; 1062 SW Coleman Avenue, Port St. Lucie,

23   Florida, and it appears below the names of the borrowers

24   on the signature page, as well as on Page 3 of the

25   mortgage.

Trial
November 16, 2016

1    Q.   Okay.  And based on your review of the mortgage

2  on this loan, is this a first mortgage?

3    A.   Yes.

4    Q.   And is this mortgage superior to all other

5  mortgages or any other liens that are on the property?

6    A.   I am not an expert at title advice but,

7  according to my review of our business records, yes.

8    Q.   And was this recorded?

9    A.   Yes.  It has recording information for the

10  Clerk of the Circuit Court, St. Lucie County.

11        MR. BARSKY:  Your Honor, I do have a copy of

12     the note and mortgage.  If you want I can transfer

13     it, or do I do that at the end?

14        THE COURT:  You -- it's already been filed;

15     right or not?  Did you file it with a notice of

16     filing?

17        MR. BARSKY:  I have a notice of filing.  I can

18     give you the notice of filing.

19        THE COURT:  Okay.  You can do that now.

20        MR. BARSKY:  Here is the notice of filing with

21     the original note and mortgage, and I have a copy.

22        THE COURT:  And, for the record, the original

23     note and mortgage were filed in open Court.

24        (Plaintiff's Exhibit 6 was marked for

25  identification.)

74

1   BY MR. BARSKY:

2       Q.   I am showing you what is marked as Plaintiff's

3   Exhibit No. 6.  Do you recognize that document?

4       A.   Yes, I do.

5       Q.   And what is that document?

6       A.   It is a screenshot of what is know as DocTrack.

7   It's a system software that we use internally at

8   Nationstar to determine the location of various

9   documents, including the collateral file, which includes

10  the original note, original mortgage, title policy and

11  those types of documents.

12      Q.   Okay.  And is that record kept in the regular

13  course of conducted business?

14      A.   Yes, it is.

15      Q.   And is it internally made and kept in the

16  course of business in the usual business practice?

17      A.   Yes, it is.

18      Q.   And was it made at or near the time of the

19  occurrence of the matter?

20      A.   Yes.

21      Q.   And is it made by a person with knowledge or

22  from information transmitted by a person with knowledge?

23      A.   Yes.

24          MR. BARSKY:  Your Honor, I would offer

25      Plaintiff's Exhibit 6 into evidence.

Atkinson-Baker Court Reporters
www.depo.com

1              MR. STEELE:  No objection.

2              THE COURT:  Without objection, it will be -- it

3      will be introduced into evidence as Plaintiff's 6.

4              (Plaintiff's Exhibit 6 was admitted into

5      evidence.)

6      BY MR. BARSKY:

7         Q.    Upon reviewing that document, what does that

8      document indicate?

9         A.    Well, one of -- the are some indications on

10     there, such as the loan number, the name of borrower,

11     the original loan, and then it goes -- it lists various

12     documents.  And one of the documents that's listed is

13     the collateral file, and it lists it's condition as

14     original, meaning the collateral file would include the

15     original note, and the location type says, attorneys.

16     The location is Robertson, Anschutz & Schneid, our

17     current counsel, and the location, the date.  The date

18     that it was determined to be at that location was

19     October 1, 2014.

20        Q.    Was it sent directly from you to Robertson,

21     Anschutz or was it sent someplace else prior to that?

22        A.    No.  Prior to the note being with Robertson,

23     Anschutz & Schneid, it was with Choice Legal Group, a

24     firm that we intended to use to prosecute the

25     foreclosure matter.  But prior to the process of filing,

Trial
November 16, 2016

```
 1    we transferred the file and asked them -- or instructed

 2    them to send it to Robertson, Anschutz & Schneid.

 3            (Plaintiff's Exhibit 7 was marked for

 4         identification.)

 5    BY MR. BARSKY:

 6       Q.   I am showing you what's marked as Plaintiff's

 7    Exhibit No. 7.  Do you recognize that document?

 8       A.   I do.

 9       Q.   And what is it?

10       A.   It is what's known as a bailee letter in our

11    business records for this loan, and it is reflecting

12    that the original documents, as listed on this document

13    and checked off --

14       Q.   Do you recognize it?

15       A.   Yes, I do.

16       Q.   Okay.  Is it kept in the regular course of

17    conducted business?

18       A.   It is.

19       Q.   And is it routinely made and kept in the course

20    of business -- the business's usual practice?

21       A.   Yes.

22       Q.   And was it made at or near the time of the

23    occurrence of the matter?

24       A.   Yes.

25       Q.   And was it made by a person with knowledge or
```

```
 1     from information transmitted by a person with knowledge?
 2         A.   Yes.
 3             MR. BARSKY:   I would offer the bailee letter in
 4     as Plaintiff's Exhibit No. 7.
 5             MR. STEELE:   I -- I would just object on the
 6     basis of trustworthiness and -- and hearsay.   I
 7     believe that it is a document between Choice Legal,
 8     I think, and Robertson -- and the bank, I think.   So
 9     I don't know how it qualifies as a business record
10     of Nationstar, and I don't know how he would know
11     that it would be what it was.
12             THE COURT:   Response.
13             MR. BARSKY:   They were the -- Choice Legal
14     would have been their agent, and they would be on
15     their behalf transferring it over to us.   So they
16     are the new agent.   So based that theory, I think it
17     should be coming in.
18             THE COURT:   Overruled.   It will be introduced
19     into evidence as Plaintiff's 7.
20             MR. BARSKY:   Seven.
21             (Plaintiff's Exhibit 7 was admitted into
22     evidence.)
23             THE COURT:   I said, introduced as
24     Plaintiff's 7.
25             MR. BARSKY:   Yes.   I thought so, yes.
```

Trial
November 16, 2016

```
 1              THE COURT:  Yes, introduced as Plaintiff's 7.
 2              MR. BARSKY:  Oh, okay.  So this is Plaintiff's
 3        Exhibit No. 7.  I thought he objected to it.
 4              THE COURT:  I overruled -- I overruled the
 5        objection.
 6              MR. BARSKY:  Oh, I'm sorry.  I didn't hear you.
 7              THE COURT:  Next question.
 8    BY MR. BARSKY:
 9        Q.    What does that letter -- letter indicate?
10        A.    The letter is, with it's own language,
11    indicates that the original documents indicated below
12    are being delivered to Robertson, Anschutz & Schneid,
13    P.L. from Choice Legal Group, P.A., and it has a handful
14    of documents checked off, including promissory note and
15    next to it there is handwritten word, endorsed, the
16    title policy, the note certification, and mortgage.  And
17    it also contains a signature and above the line and
18    below that line it has company, Robertson, Anschutz &
19    Schneid, P.L.
20        Q.    Is there a date?
21        A.    Yes.  The document has a date of May 27, 2014.
22        Q.    And was that prior to filing this lawsuit?
23        A.    Yes.
24              MR. STEELE:  And, Your Honor, if it will save
25        time, I will go -- I will stipulate to Plaintiff's
```

79

1       Exhibit No. 8.

2           MR. BARSKY:  Plaintiff's Exhibit No. 8.  It's

3       an assignment of mortgage.

4           THE COURT:  Okay, No. 8 is in evidence, without

5       objection.

6           (Plaintiff's Exhibit 8 was stipulated into

7       evidence.)

8       BY MR. BARSKY:

9       Q.   Is there a -- are you familiar with the -- this

10      assignment of mortgage?

11      A.   Yes, I am.  This is a certified copy of an

12      assignment of mortgage that we also have a copy of in

13      our business records for this loan.

14      Q.   And what does this indicate?

15      A.   The document in it's own language appears to be

16      assigning the mortgage together with the note from Bank

17      of America, the signatory of the document, to Nationstar

18      Mortgage, LLC.  And it's dated December 30, 2013, and

19      it's recorded March 20, 2014, which, I believe, is prior

20      to this complaint.

21      Q.   And it -- and it transferred both the note and

22      mortgage; correct?

23      A.   As the language appears to indicate -- again, I

24      am not an attorney, and I can only read the document for

25      what it states.

Atkinson-Baker Court Reporters
www.depo.com

1          MR. STEELE:  I will stipulate to it.

2          THE COURT:  Nine is stipulated in evidence.

3     Okay, thanks.

4          (Plaintiff's Exhibit 9 was stipulated into

5     evidence.)

6     MR. BARSKY:

7     Q.    Please indicate what that document is.

8     A.    I'm sorry.

9     Q.    Exhibit 9, would you indicate what that is?

10    A.    Yes.

11    Q.    What is it?

12    A.    It is a copy of the certification of possession

13    pursuant to Florida Statute 702.015(4), and it has a

14    copy of the note, which appears to mirror the original

15    note that we have here today.

16    Q.    Thank you.  And it's dated prior to filing the

17    lawsuit?  Is there a date on there?

18    A.    November 13 -- November 13, 2014 is the date

19    that the verification appears to have occurred.

20         MR. STEELE:  I will stipulate to this one as

21    well.

22         THE COURT:  Ten is stipulated into evidence.

23         (Plaintiff's Exhibit 10 was stipulated into

24    evidence, Plaintiff's 10.)

25    BY MR. BARSKY:

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      Q.    Do you recognize that document?

2      A.    Yes.   This is a copy of the breach letter that

3  was sent by Nationstar.

4      Q.    And who -- who did it go to?

5      A.    It went first -- by first-class mail to

6  Joseph -- Joseph P. Akowskey and Pauline E. Akowskey at

7  the property address, which is 1062 SW Coleman Avenue.

8      Q.    And what does that letter indicate?

9      A.    The letter is dated September 26, 2014, and it

10 has information about a default on the loan.   It states

11 you have not made payments on your loan since June 1,

12 2012.   It includes an amount that is listed as the cure

13 amount, and it has other information about potential

14 remedies, the timeframe to cure the default, and other

15 disclosures such as the SCRA, and who they can contact

16 to speak about the loan.

17         MR. BARSKY:   Thank you.

18         MR. STEELE:   I will stipulate to this one as

19     well.

20         THE COURT:   Eleven.

21 BY MR. BARSKY:

22     Q.    Plaintiff's No. 11; do you recognize that

23 document?

24     A.    I do.   This is a copy of -- the certified

25 version of the breach letter that I just reviewed in the

82

Trial
November 16, 2016

 1    previous exhibit, and it has the same information.  The
 2    only difference is that this is a certified version.
 3         Q.   All right.  So it's the same thing.  Okay.
 4              THE COURT:  Eleven -- 11 is in evidence.
 5              (Plaintiff's Exhibit 11 was stipulated into
 6    evidence.)
 7              MR. STEELE:  I will stipulate to 12 as well.
 8              THE COURT:  Okay, 12 is stipulated into
 9         evidence.
10              (Plaintiff's Exhibit 12 was stipulated into
11    evidence.)
12    BY MR. BARSKY:
13         Q.   Do you recognize that document?
14         A.   I do.
15         Q.   And what is that document?
16         A.   This is tracking information for the breach
17    letter.
18         Q.   And what does that -- looking at that tracking
19    information, what would that let you know?
20         A.   It would let me know that, in fact, the breach
21    letter did go out.
22         Q.   Does it give you the date?
23         A.   Yes.  It indicates 9/26/2014.
24         Q.   And what other things does that -- the tracking
25    information indicate?

Atkinson-Baker Court Reporters
www.depo.com

```
1        A.   It indicates that it was actually mailed, and

2   that it went through various facilities, and delivery

3   was attempted, and it was unclaimed and again unclaimed.

4             MR. STEELE:  And no objection to 13.

5             THE COURT:  Without objection, 13 is introduced

6        into evidence.

7             (Plaintiff's Exhibit 13 was admitted into

8   evidence.)

9   BY MR. BARSKY:

10       Q.   Do you recognize that document?

11       A.   I do.

12       Q.   And what is that document?

13       A.   This is copy of what's known as a return

14  receipt or green card that corresponds to the certified

15  version of the breach letter.

16       Q.   And what does that indicate?

17       A.   It indicates that the breach letter was sent

18  out, and it also indicates return to sender, unclaimed,

19  unable to forward.

20            (Plaintiff's Exhibit 14 was marked for

21  identification.)

22  BY MR. BARSKY:

23       Q.   I am showing you what's been marked as

24  Plaintiff's Exhibit No. 14.  Do you recognize that

25  document?
```

84

Trial
November 16, 2016

1    A.   Yes, I do.

2    Q.   And what is that document?

3    A.   This is a payment history that is part of our

4  business records for this loan.  It comes over from Bank

5  of America, NA, which is the prior servicer, and it did

6  undergo our quality assurance or on-boarding process

7  that I described earlier.

8    Q.   And was that made in the normal course of

9  conducted business activity?

10   A.   Yes.

11   Q.   And is it one that is routinely made and kept

12  in the course of business in the business's usual

13  practice?

14   A.   Yes.

15   Q.   And is it one made at or near the time of the

16  occurrence of the matter?

17   A.   Yes.

18   Q.   And was it made by a person with knowledge or

19  from information transmitted from by a person with

20  knowledge?

21   A.   Yes.

22      MR. BARSKY:  I would offer the payment history

23   as Plaintiff's Exhibit No. 14.

24      MR. STEELE:  My objection would be on the basis

25   of improper foundation and lack of trustworthiness,

1        on the basis -- it just -- it -- the borrower's name

2        is not noted on the document.  The borrower's

3        address is not noted on the document.  It doesn't

4        indicate that it came from Bank -- Bank of America's

5        name is not indicated anywhere on it, and it's just

6        a -- I don't know -- it could be anybody's document.

7               THE COURT:  I need to see it.  Thanks.  There

8        is no way to authenticate this other than his

9        testimony that -- where did you say this came from?

10              THE WITNESS:  It came from Bank of America, NA,

11       the prior servicer.

12              THE COURT:  And how do you know that?

13              THE WITNESS:  I know that for a variety of

14       reasons.  One of them -- on the top left-hand corner

15       in the column going down, you will see a loan number

16       that begins with 8, and that is the loan number that

17       was -- that was designated for the loan at Bank of

18       America.  Also, you will see that --

19              THE COURT:  For this loan that is at -- at

20       issue here today?

21              THE WITNESS:  Yes, Your Honor.

22              THE COURT:  Okay.  Well, I will sustain the

23       objection, unless you are going to ask him those --

24       those kind of questions.

25       BY MR. BARSKY:

1      Q.   Is there anything in that document that

2    indicates that this is -- is from Bank of America?

3      A.   The account number that I referred to on the --

4    on the left-hand side of the document.  It's ▮▮▮▮▮▮▮▮

5    And also the beginning unpaid principal balance of the

6    loan matches the original note and loan, and the

7    duration of the servicing which is from origination to

8    the time that Nationstar inherited the servicing, and

9    that's where it ends.  So those things confirm to me

10   that the document is from Bank of America, NA, and is

11   now part of our business records --

12           THE COURT:  Is it now or not?

13           THE WITNESS:  Now, n-o-w.

14           THE COURT:  Okay.  Overruled.  It will be

15      introduced into evidence as Plaintiff's 14.

16           (Plaintiff's Exhibit 14 was admitted into

17   evidence.)

18           (Plaintiff's Exhibit 15 was marked for

19   identification.)

20   BY MR. BARSKY:

21      Q.   I am showing you what has been marked as

22   Plaintiff's Exhibit No. 15.  Do you recognize that

23   document?

24      A.   Yes.  This is Nationstar's detailed transaction

25   history, essentially a payment history from the time

1    Nationstar began servicing this loan until recently.

2            MR. STEELE:  And I have no objection.

3            THE COURT:  Without objection, 15 will be

4        introduced into evidence.

5            (Plaintiff's Exhibit 15 was admitted into

6    evidence.)

7    BY MR. BARSKY:

8        Q.   And the payment history indicates any payments

9    made -- what does that payment history indicate?

10       A.   Well, it indicates the next due date -- the

11   next contractual due date, which is June 1, 2012, the

12   same default date that's in the breach letter that I

13   previously testified to.  It includes the interest rate,

14   which is 4.375, the -- the same interest rate from the

15   time of origination, and also the principal balance of

16   $95,268.48.

17       Q.   And what is the current status of this loan?

18       A.   The loan is in default.

19           (Plaintiff's Exhibit 16 was marked for

20   identification.)

21           MR. STEELE:  No objection as to this one, Your

22       Honor.

23           THE COURT:  Sixteen is introduced into evidence

24       without objection.

25           (Plaintiff's Exhibit 16 was admitted into

1    evidence.)

2    MR. BARSKY:

3        Q.   I am showing you what's -- Plaintiff's Exhibit

4    No. 16.  Do you recognize that document?

5        A.   I do.  They are screenshots or screen prints of

6    various information in our system of record, which is

7    LSAMS, spelled L-S-A-M-S.  And it includes information

8    about the escrow account that includes hazard insurance

9    and county tax.  It has payoff information which has the

10   principal balance of the loan at $95,268.48.  The

11   interested calculated in arrears, $18,693.97 with a per

12   diem of $11.42.  It has information about corporate

13   advances that have been made on the loan.

14            (Plaintiff's Exhibit 17 was marked for

15   identification.)

16   BY MR. BARSKY:

17       Q.   I am showing you what's marked as Plaintiff's

18   Exhibit No. 17.  Do you recognize that document?

19       A.   I do.  It contains documents that were in the

20   most recent exhibit admitted.  In addition, there are

21   two pages that -- the first two pages of the document.

22   It is entitled J-Figs worksheet.

23            Essentially, the J-Figs worksheet is a kin to a

24   payoff statement or a payoff worksheet, which includes

25   the principal balance, past due interest, per diem, the

89

Trial
November 16, 2016

1  same information I just conveyed in the -- to the prior

2  exhibit.  And this -- this is information that we would

3  rely on in addition to other documents on the loan to

4  put together the figures that we have in our proposed

5  final judgment.

6      Q.   And is that a record kept in the regular course

7  of conducted business activity?

8      A.   It is.

9      Q.   And is it one that is routinely kept in the

10 course of business in the business's usual practice?

11     A.   Yes.

12     Q.   And was it made at or near the time of the

13 occurrence of the matter?

14     A.   Yes, it is.

15     Q.   And is it made by a person with knowledge or

16 transmitted by -- to a person with knowledge?

17     A.   Yes.

18          MR. BARSKY:  Your Honor, I am going to offer

19     Plaintiff's Exhibit No. 17 into evidence.

20          MR. STEELE:  Objection on the basis of lack of

21     proper foundation and trustworthiness.

22          THE COURT:  The objection is overruled.  It

23     will be introduced into evidence as Plaintiff's 17.

24          (Plaintiff's Exhibit 17 was admitted into

25 evidence.)

```
 1   BY MR. BARSKY:
 2        Q.    Have you reviewed the payment history and
 3   J-Figs and everything with regard to this loan?
 4        A.    Yes, I have.
 5        Q.    Do you know what the principal balance is?
 6        A.    Just over 95,000.
 7        Q.    Do you know the exact number?
 8        A.    I would have to refresh my memory by reviewing
 9   th payment history.
10        Q.    Anything else?  Would the J-Figs help?
11        A.    The J-Figs worksheet will help as well.
12             MR. BARSKY:  May I have Exhibit No. 17, please.
13             THE WITNESS:  The unpaid principal balance is
14        $95,268.48.
15   BY MR. BARSKY:
16        Q.    And what is the interest?
17        A.    Interest through October 26, 2016 is
18   $18,693.97, with a per diem through today of $11.42
19   daily.
20        Q.    Are there any property inspections?
21        A.    Yes.  The property inspection costs, $435 that
22   we are including on the proposed final judgment, as well
23   as BPO costs of $90.
24        Q.    Was there any insurance paid?
25        A.    Yes.  The insurance and the taxes are also
```

91

1    included in the proposed final judgment.  Those figures

2    are, respectively, $4,561, and for tax advances

3    $2,170.59, and I believe the total amount we are seeking

4    on our proposed final judgment is a grand total of

5    $106,000 and some change.

6        Q.   Thank you.  Does the -- the note and mortgage

7    require that you be ent -- be reimbursed for costs?

8        A.   I believe so.

9        Q.   Is this a Fannie Mae loan?  Do they get any

10   attorneys fees?

11       A.   It is a Fannie Mae loan.  We are not including

12   the attorney's fees in our proposed final judgment.

13            MR. BARSKY:  Your Honor, we filed an affidavit

14       of costs on November 10th indicating those --

15       indicating the amounts that he testified to.

16            THE COURT:  Okay, thank you.

17            MR. BARSKY:  And I have no further questions.

18            THE COURT:  Cross-examination.

19                       CROSS-EXAMINATION

20   BY MR. STEELE:

21       Q.   As I understand it, you first started working

22   for Nationstar in April of last year; was it?

23       A.   In 2015, correct.

24       Q.   So you were never involved in the servicing of

25   this loan from 2013 -- I believe it was November of 2013

Atkinson-Baker Court Reporters
www.depo.com

```
 1    when Nationstar took over the servicing of the loan

 2    until the lawsuit was filed; is that correct?

 3        A.   That's correct in the sense that I wasn't

 4    employed by Nationstar when Nationstar required the

 5    servicing, and around the time of the complaint I wasn't

 6    there either.

 7        Q.   And you also weren't there when Nationstar

 8    boarded the loan, would that be a fair statement, from

 9    Bank of America?

10        A.   That's correct.

11        Q.   So whatever information that you would have

12    about this loan is based upon your review of the

13    business records that have been introduced into evidence

14    today; is that correct?

15        A.   Yes, as well as any training I have had at

16    Nationstar about procedures with regards to mortgage

17    servicing.

18        Q.   Now, if I am not mistaken, the complaint

19    alleged, as did the breach letter that was introduced as

20    Exhibit 10, that Mr. Akowskey had not made payments on

21    his mortgage since June 1st of 2012; do you remember

22    that?

23        A.   I believe I do.  May I take a look at it?

24        Q.   Sure, sure.

25             MR. STEELE:  If I could see No. 10 --
```

Trial
November 16, 2016

1      Exhibit 10 -- Plaintiff's Exhibit 10.

2   BY MR. BARSKY:

3     Q.   And I would direct you to the fifth paragraph

4   down, which says, "You have not made your payments" and

5   just ask you if you could read that into the record.

6     A.   Yes.  The sentence you referred to, it states

7   within the breach letter, "You have not made payments on

8   your loan since June 1, 2012.  You are due for all

9   payments from and including that date.  The failure to

10  make these payments is a default under the terms and

11  conditions of the mortgage loan."

12     Q.   But that's not correct; is it?  Mr. Akowskey

13  made a number of payments -- I think it was 13

14  payments -- after June 1st of 2012, isn't that correct,

15  to Bank of America?

16     A.   I believe those are two questions, and I will

17  answer both of them.

18     Q.   Sure.

19     A.   The breach letter is correct in the sense that

20  June 1, 2012 is the contractual due date.  And what --

21  when we refer to a date of default in our breach

22  letters, we refer to the contractual due date and that's

23  when it is due for and was due at the time of the

24  complaint.  Now, Mr. Akowskey --

25       THE COURT:  I don't know what that means.  I

1    don't understand what you just said.

2         THE WITNESS:  Okay.  So, every month that a

3    payment is due, it is a contractual due date based

4    on the note, because it says it is due at the

5    beginning of the month and there is a monthly

6    installment that is due every month, and that's the

7    contractual due date.

8         THE COURT:  Okay.

9         THE WITNESS:  That's what I mean by that.  I

10   hope that clears it up.

11        THE COURT:  It does.  So you said he had a

12   payment that was due on that particular date which

13   was his contractual due date?  Is that what you are

14   telling me?

15        THE WITNESS:  Yes, Your Honor.

16        THE COURT:  Why would you send a default letter

17   saying somebody has defaulted when they haven't

18   defaulted because they are -- it's on their

19   contractual due date?

20        THE WITNESS:  Well, the breach letter was sent

21   out long after that date.  It was sent out on

22   September 26, 2014, nearly two years after the

23   contractual default.

24        THE COURT:  So you are saying in the letter

25   that the -- he missed his payment for that June 1;

1    is that what you are telling me?

2        THE WITNESS:  Yes, the contractual payment;

3    yeah -- yes.

4        THE COURT:  Which triggered the -- which

5    triggers the default?  If they haven't made the

6    payment on that date, it triggers the default?  No?

7        THE WITNESS:  I don't know if -- if -- I don't

8    want to give legal information because I -- I am not

9    an attorney, but --

10       THE COURT:  I just want to know what the bank

11    believes is the first date he missed his payment.

12       THE WITNESS:  June 1, 2012.

13       THE COURT:  But I thought there was -- there

14    are -- there is information in the record that he

15    made payments after June 1, 2012?

16       THE WITNESS:  Chronologically, yes, he did make

17    payments which were partial payments as part of a

18    trial modification program.  There is no doubt about

19    that, but the contractual date --

20       THE COURT:  It takes 13 payments to determine

21    whether or not somebody is in a trial modification?

22       THE WITNESS:  These were payments that were

23    made to Bank of America, and the answer is, I can't

24    comment on how long it would take.  I can give more

25    information if the Court wishes about the

1    circumstances of the trial modification though.

2         THE COURT:  No.  Mr. Steele has more questions.

3    I was just curious what that date really signified.

4    Mr. Steele.

5         MR. STEELE:  Yes.

6    BY MR. STEELE:

7    Q.   The letter says, "You have not made payments on

8    your loan since June 1, 2012;" correct?

9    A.   That's what the language in it says.

10   Q.   It doesn't say anything about partial payments

11   or that -- that this is the due date, June 12th, and we

12   acknowledge it.  It says, "You have not made payments on

13   your loan since June 1, 2012", and you are saying that's

14   correct, that he had not made payments on his loan since

15   June 1, 2012?

16   A.   As it relates to the contractual due date, yes.

17   Q.   Well, you have had an opportunity to look

18   through Bank of America's payment history records, which

19   I think were marked as Exhibit 14; correct?

20   A.   Yes.

21   Q.   And you saw on Bank of America's payment

22   history records where Mr. Akowskey made a number of

23   payments after June 12th of 2014; correct?

24   A.   Yes.

25        MR. STEELE:  All right.  Let me, if I could,

Atkinson-Baker Court Reporters
www.depo.com

1      grab -- or ask for Exhibit 14, please, Plaintiff's

2      Exhibit 14.

3  BY MR. STEELE:

4      Q.   I am showing you what has now been marked as

5  Plaintiff's Exhibit 14 and ask you to look at Page 2

6  of 3 about two-thirds of the way down, and do you see

7  where there were three payments made of $790.31 on

8  September 4th of 2012, October 1st of 2012, and

9  November 1st of 2012, do you see those?

10     A.   Do you mind repeating the dates, please.

11     Q.   Sure.  September 4th of 2012, October 1st of

12  2012, and November 1st of 2012, which coincides with the

13  dates that he was supposed to make the three trial

14  payments to qualify for the permanent modification?

15     A.   Those were the contractual due dates, yes, that

16  you are referring to.

17     Q.   Yes.  And do you see where he made those three

18  payments on those dates?

19     A.   Yes, I do.

20     Q.   And do you also see that after he made those

21  three payments, a little bit further down on Page 2

22  of 3, where he made another payment for December -- on

23  December 3rd of 2012 in the amount of $790.31?

24     A.   Yes, I do.

25     Q.   And do you see where he made a payment -- it's

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    kind of cut off at the bottom -- but it's -- it's at the

2    very last part of Page 2 and going over to Page 3 of 3

3    at the very top, it looks like that on January the 2nd

4    of 2013, he made another payment of $790.31; do you see

5    that?

6        A.   Yes, I do.

7        Q.   And do you see that on January 18th of 2013, he

8    made his -- his payment under the terms of the confirmed

9    modified agreement in the amount of $755.21?  I think

10   it's like the fourth line down.

11       A.   I see that amount.  I do see the date, but just

12   to be sure I will make it clear for the Court, that

13   there was no final modification.  This -- these payments

14   were part of the trial modification.

15       Q.   Okay.  Well, I think the Court will ultimately

16   make that determination based upon the evidence.  But do

17   you see where he made a March payment on February 25th

18   of 2013 in the amount of $755.21, about a quarter of the

19   way down, maybe five or six lines down, on Page 3 of 3?

20       A.   It was March 2012?  I'm sorry.

21       Q.   It was for his March payment, but he sent it in

22   on February 25th of 2013 for $755.21?

23       A.   Yes, I do see that.

24       Q.   And do you see the one for April 1st of 2013

25   for 755.21 right below that?

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1     A.    Yes, yes.

2     Q.    And then a few lines down below that, May 2nd

3  of 2013, another payment of $755.21?

4     A.    Yes.

5     Q.    And do you see for the June payment on May 29th

6  of 2013, he made a payment of $755.21?

7     A.    Yes.

8     Q.    And on June 28th of 2013 he made his July

9  payment of $755.21?

10    A.    Yes.

11    Q.    And on July 26th of 2013, he made his payment

12  for August for $755.21?

13    A.    Yes.

14    Q.    And do you see down at the bottom or close to

15  the bottom there -- three -- three or four lines up on

16  September the 4th of 2013 -- he made a payment of

17  $755.21?

18    A.    Yes, I do.

19    Q.    And do these records reflect that any of these

20  payments were returned to Mr. -- Mr. Akowskey by Bank of

21  America?

22    A.    No.   In fact, these payments were applied to

23  the loan once they completed a contractual payment.

24  Again, these payments were not contractual payments in

25  the sense that they adhere to the original note.   They

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    were part of a trial modification, and these payments

2    were accepted and when there was enough for a

3    contractual amount, it would be applied to the loan

4    accordingly.

5         Q.   Now, at the very end of Bank of America's

6    records on the very last line, the second column over, I

7    think, is supposed to reflect the -- the due date,

8    meaning how -- what the current -- I guess it would be

9    the fourth column over, meaning that was the contractual

10   due date that he had paid through at least as far as

11   Bank of America was concerned; do you see that?

12        A.   Yes, that's correct.  And it --

13        Q.   And it shows -- just answer the question -- and

14   that shows that he had paid through December 1st of

15   2012, according to Bank of America's records, when they

16   released their loan to you; is that correct?

17        A.   That's correct.

18        Q.   So, according to Bank of America then, he had

19   not made payments just through June of 2012.  According

20   to them, he had made them through December of 2012; is

21   that correct?

22        A.   Yes, on the Bank of America payment history,

23   you are correct.

24        Q.   Well, if you look at the beginning entry on

25   your -- Nationstar's records, don't you see that you

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1    indicate when you first took this loan into Nationstar,

 2    which would be Exhibit 15, which I think you do have

 3    there?

 4        A.    I don't.

 5        Q.    Nope.

 6        A.    May I look at it so I can answer your

 7    questions.

 8             MR. STEELE:   Okay.  If I could --

 9             THE WITNESS:   Thank you.

10    BY MR. STEELE:

11        Q.    And if you would take a look at -- I think it's

12    page -- it would be almost the last page here -- yeah --

13    the last page, which is the very first entry on Page 12.

14    It says, next due, you indicate -- Nationstar indicates

15    that the next due date is January of 2013, meaning that

16    that's when the next payment was due; is that correct?

17        A.    That's how the payment history begins, yes.

18        Q.    Okay.  So it does not indicate that the next

19    payment is due as of June of 2012.  It says that the

20    next payment that was due was for January of 2013,

21    correct, on Nationstar's own records?

22        A.    For the first entry, yes, but I can explain how

23    the June 1, 2012 date -- date of default comes into play

24    if counsel or the Court will allow me.

25        Q.    I will -- I will let your attorney explain --
```

102

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1      ask you to explain that.  I have got some other

 2      questions I want to check with you about.

 3              The -- Exhibit 3, which is the hello letter

 4      from Nationstar, indicates a primary phone number for

 5      Mr. Akowskey of -- it looks like 772 -- I think it's

 6      408-6969; do you see that?

 7          A.   I do.

 8          Q.   Do you know whose phone number that is?

 9          A.   By looking at the number by itself, no, I don't

10      know.

11          Q.   Let me show you --

12          A.   Actually, if I may correct my answer, it

13      indicates that this is the contact information that we

14      have online for this account.

15          Q.   But do you know whose phone number that is?

16          A.   By heart, I don't know unless I look at other

17      information.

18          Q.   I would like to show you Nationstar's

19      collection history profile records that were provided to

20      me when I took your deposition, and ask you if you could

21      take a look at this entry on Page 5, dated November 13th

22      of 2013.

23              MR. BARSKY:  Objection, he is going to be

24          testifying from a document that is not in evidence.

25              MR. STEELE:  I am just asking whether it is
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
1        going to refresh his recollection as to whose phone

2        number that might be based upon their records.

3              THE COURT:  You will have to ask him whether he

4        knows -- knows the number to begin with.

5              MR. STEELE:  Well, he said he didn't.  He said,

6        I -- I don't know.

7              THE COURT:  Okay.  If it's using it to refresh

8        his recollection, the objection is overruled.

9   BY MR. STEELE:

10       Q.   Take a look at this here, an entry for

11  November 13th of 2013, and ask -- and see if that

12  refreshes your recollection as to whose phone number

13  that is.

14       A.   The same number appears in the document I have

15  just been handed, and it's under attorney Trent Steele.

16       Q.   So that's my phone number; correct?

17       A.   Well, that's the number that appears there.

18  I -- I haven't personally verified your phone number.

19       Q.   So -- but Nationstar, apparently, was given my

20  name associated with that phone number as the contact

21  information for Mr. Akowskey on November 13th of 2013

22  when you first took this loan over; correct?

23       A.   On November 13, 2013, the entry that you are

24  referring to, it says, talked to mister -- which it

25  implies mister as the primary borrower -- and it says,
```

104

Trial
November 16, 2016

1    attorney Trent Steele.  Beyond that, I can't speculate

2    what else it could mean, but that that is the attorney

3    information for Mr. Akowskey.

4         Q.   Well, if you look at the top of the collection

5    history profile where it has the phone number for

6    Mr. Akowskey, it also has that -- it says, home number,

7    and it says 772-408-6969 and that's my phone number;

8    correct?

9         A.   Again, I haven't personally verified it, but

10   it's the same information that appears in the entry

11   about attorney information which is tied to you.

12        Q.   I would like for you to take -- well, do you

13   recall Mr. Akowskey ever calling in to Nationstar and

14   asking them to please stop contacting him and to please

15   address all further communications to me, his lawyer?

16             MR. BARSKY:  Objection, relevance, Your Honor.

17             THE COURT:  And the relevance would be --

18             MR. STEELE:  That he -- the address where

19        the -- for notices where he wanted to be

20        communicated with by Nationstar.

21             THE COURT:  Regarding Paragraph 22 --

22             MR. STEELE:  Yes.

23             THE COURT:  Overruled.

24             THE WITNESS:  I would have to look at the

25        document that I have been handed to determine --

105

Atkinson-Baker Court Reporters
www.depo.com

1    BY MR. STEELE:

2        Q.   Well, let's just take a look at one of the

3    entries here for -- I believe it's on page -- at the

4    bottom of Page 17 and the top of Page 18 --

5            MR. BARSKY:  Your Honor, I am going to object.

6        Now -- now he is questioning him about a document

7        that's not in evidence.  First, it was just to

8        refresh his recollection, and now he is starting to

9        question him about it.

10           THE COURT:  It's the collection notes?

11           MR. STEELE:  Yes.

12           THE COURT:  And those aren't in evidence?

13           MR. BARSKY:  No.

14           MR. STEELE:  Not as of yet.  I mean -- but they

15       are their records.  I mean, I can certainly -- right

16       now I am just asking if it refreshes -- he said, I

17       don't remember whether he told us to contact us at

18       that address.

19           And I am asking him whether or not these

20       collection history records from Nationstar refreshed

21       his recollection about whether Mr. Akowskey gave

22       them an -- an address other than his.

23           THE COURT:  You can't -- it can't reflect --

24       refresh his recollection if he wasn't even with the

25       company at the time; can it?  The objection is

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1        sustained.  You can ask him if those are his --

 2        their business records and kept in the regular

 3        course of business.

 4             MR. STEELE:  Yes.  Do you have any objection to

 5        the collection history profile notes being

 6        introduced into evidence?

 7             MR. BARSKY:  Yes, I do.

 8             THE COURT:  What is your specific legal

 9        objection to the bank's --

10             MR. BARSKY:  Relevance.

11             THE COURT:  -- the bank's or the servicer's own

12        collection notes that were produced during the

13        course of discovery?

14             MR. BARSKY:  Relevance.

15             THE COURT:  Relevance?  Well, you have been

16        asking him -- hammering away on him regarding the

17        issues -- the issues that are involved in this case.

18        The objection is overruled as to relevance.

19             MR. STEELE:  Then let me go ahead and have

20        these marked as Defendant's Exhibit 5.

21             (Defendant's Exhibit 5 was marked for

22    identification.)

23    BY MR. STEELE:

24        Q.  Let me ask you this then.  If you take a look

25    at the Nationstar business records at the bottom of
```

107

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1    Page 17 and the top of Page 18, do you see where
 2    Mr. Akowskey apparently called in asking that you please
 3    contact his attorney at this point because he is
 4    undergoing surgery -- and that was in July of 2013, and
 5    that the representative advised that he would contact
 6    the attorney?
 7         A.   You are referring to the comment on --
 8         Q.   The top of Page 18.
 9         A.   -- July 7, 2014?
10         Q.   Correct, yes, and that would be two months
11    before the notice of intent to accelerate letter was
12    sent out, I believe.
13         A.   I -- I will read the comment.  "Talked to --
14         Q.   Well, my question -- can you just answer my
15    question.  Does it indicate that Mr. Akowskey called in
16    asking that you please contact his attorney as he is a
17    disabled veteran and that he is about to undergo surgery
18    and that he wants -- the representative advised that --
19    that -- that he would, in fact, contact the attorney; do
20    you see that?  Is that what that says?
21         A.   Yes.  Yes, and, in fact, the rep did attempt to
22    contact the business phone number which -- which now I
23    believe would be your office number.
24         Q.   Yeah.  Let's -- let's talk about that because
25    I -- I had a lot of fun with this one.  Let's go to the
```

108

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1    entry --

 2              MR. BARSKY:  Objection.

 3              MR. STEELE:  Sorry.  I'm sorry.  I will

 4       withdraw.

 5              THE COURT:  No self-serving comments.

 6              MR. STEELE:  Sorry, sorry.

 7    BY MR. STEELE:

 8       Q.    How about if you take a look at Page 4 about

 9    two-thirds of the way down where somebody named Cageyman

10    from Nationstar attempted to call my office; do you see

11    that where it says invalid phone number?

12       A.    Yes, I do see the entry, invalid phone number.

13       Q.    Okay.  So the number at the top of the page --

14              THE COURT:  You said Cagy -- Cageyman?

15              MR. STEELE:  Cageyman.

16              THE COURT:  C-a-g-y?

17              MR. STEELE:  Yes; C-a-g-e-y-m-a-n.  I don't

18       know; that's what it says so.

19              MR. BARSKY:  Is that his name?

20              MR. STEELE:  Apparently.

21              MR. BARSKY:  That's not funny.  I mean, you are

22       laughing at it.

23              MR. STEELE:  Okay.

24              THE COURT:  Well, Cageyman, could mean a lot of

25       different -- have a lot of different meanings.
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1              MR. BARSKY:  It could.

 2              MR. STEELE:  Sure, okay.

 3              THE COURT:  I have never heard of anybody by

 4         the name -- by the name of Cageyman, but it could

 5         be.

 6    BY MR. STEELE:

 7         Q.   So the number that he indicates is invalid for

 8    my office that he has listed there is 772-406-6969; do

 9    you see that?

10         A.   Yes, I do.

11         Q.   That's not my phone number, though.  If you

12    look at the top there, my phone number is 772-408-6969.

13         A.   Yes.  But that information that you are

14    referring to at the top of the collection history, that

15    is the information that was valid as of the date of

16    printing of this document, which is October 26, 2016.

17         Q.   But you indicated that when you first took over

18    the servicing of this loan, you had the information and

19    that the phone number was 772-408-6969; correct -- right

20    there on the second page -- I think it was -- or -- I'm

21    sorry -- on the very last page because they are in

22    reversed order, maybe?

23         A.   The primary phone listed on the hello letter is

24    772-406-6969, which corresponds with that entry you

25    refer to referring to an invalid phone number.
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1         Q.   I understand that.  But if you look at the

2    notification -- apparently you all got a written

3    notification from my office with an authorization for

4    you -- your -- Nationstar to contact us.

5              MR. BARSKY:  Objection, Your Honor.  Now, he is

6         talking about other documents that aren't in

7         evidence.

8              MR. STEELE:  No.  I am talking about the

9         notation --

10             MR. BARSKY:  You said that -- you had a letter

11        sent to his office --

12             THE COURT:  Hold on.  The objection is what?

13             MR. BARSKY:  He is now -- he is now asking him

14        questions about documents that are not in evidence.

15        He is talking about letters that he sent to

16        Nationstar indicating --

17             THE COURT:  Okay, thanks, and your response is?

18             MR. STEELE:  I am talking about what's

19        indicated in the records themselves and that it --

20        that he has right there before him.  I am not

21        referring to anything other than -- than those.

22             THE COURT:  I will give you some leeway.  The

23        objection is overruled.

24   BY MR. STEELE:

25        Q.   Do you see the entry for January 20, 2013,

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    which would be 20 days after you all started servicing

2    the loan, where somebody named, Aramos, says,

3    authorization for third party, received attorney

4    representation, uploaded, and it indicates the phone

5    number is 772-408-6969; is that correct?

6         A.   I am trying to find the entry, if you can bear

7    with me.

8         Q.   I'm sorry.  It's on Page 8 about two-thirds of

9    the way down where it says, Aramos, on the side -- CS --

10   dash -- and then there is a space, authorization, and

11   then Aramos, A-r-a-m-o-s.

12        A.   I do see the -- the entry you are referring to,

13   yes.

14        Q.   Okay.  And it indicates that the phone number

15   that apparently you received and uploaded into the file

16   was 408-6969, correct, not 406-6969?

17        A.   That is the phone number that appears there,

18   408.

19             THE COURT:  Well, would that have been part of

20        the boarding process, as well?

21             THE WITNESS:  Our -- our boarding process is

22        ongoing just to be sure.

23             THE COURT:  But your boarding process would

24        it -- would it input that number -- the telephone

25        number?

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1              THE WITNESS:  This is the information that
 2       appeared on the authorization for a third party to
 3       be able to obtain information on the account.
 4              THE COURT:  But was --
 5              THE WITNESS:  This was after --
 6              THE COURT:  It was after the boarding process?
 7              THE WITNESS:  Yes, Your Honor.
 8              THE COURT:  Okay.  You can continue, thanks.
 9  BY MR. STEELE:
10       Q.   On that same page, the very first page entry
11  there, 11/19 of 13, doesn't that say, "Honoring previous
12  servicer's mod approval" there in capital letters on the
13  very top there next to L. Biaz's entry?
14       A.   Yes, it does say that.
15       Q.   And it indicates that the borrower was approved
16  for trial payments in the amount of $790.31 from 9/1/20
17  (sic) through 11/1/12 and the borrower completed all the
18  trial payments and was approved for a final modified
19  payment in the amount of $755.21 effective 2/1/13.
20  Borrower has made all of the post-mod payments from
21  February 1, 2013 to 9/1 2013; do you see that?
22       A.   I do see everything that you are saying that
23  appears there, yes.
24       Q.   Okay, all right. Let's go back to the problem
25  apparently that -- that -- that you had with trying to
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
1    get ahold of my office.  Do you see there is an entry on

2    Page 14 at the very top where, once again, somebody

3    called 772-406-69 (sic) -- and it says, call back, no

4    answer; do you see that?

5         A.   Yes, I do see that.

6         Q.   And below that, it says something about, "Will

7    notify the Florida Attorney General's Office that

8    mortgagor's will not respond to any of our outreach and

9    that they do not have any additional contact

10   information."  Do you see that?

11        A.   I do see that, yes.

12        Q.   And that was because my office filed a

13   complaint with the Attorney General's Office for your

14   refusal to -- to modify my client's loan in accordance

15   with the agreement that he had with Bank of America;

16   correct?

17             And you can look at the page back before that

18   where it says that you -- a complaint was received from

19   the Attorney General, Kevin Smith, with -- with the

20   Attorney General's Office?

21             MR. BARSKY:  Objection.  Now he is talking

22        about other documents that are not in evidence.  He

23        is talking about a complaint that he filed with the

24        Attorney General's Office.  This is -- he is not

25        refreshing his memory or recollection --
```

114

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1            THE COURT:  Is that -- is that referenced in
 2      the -- the collection notes?
 3            MR. STEELE:  Yes.
 4            THE COURT:  He is not -- he is not ref -- he is
 5      referring to what's in the collection notes.  The
 6      objection is overruled.
 7            THE WITNESS:  Aside from what you are
 8      proffering to the Court, is there something that I
 9      can look at that would help me substantiate or
10      deny --
11            THE COURT:  The collection notes.
12            MR. STEELE:   The collection notes --
13            THE COURT:  He is asking you about the
14      collection notes.
15            MR. STEELE:  -- that is what I am asking you to
16      look at.  Do you see where there is a notation on
17      Page 9 that -- for November 25th, there was a
18      complaint received?
19            You acknowledge the letter to Kevin Smith at
20      myfloridalegal.com, the Attorney General -- and then
21      it references that, "Will notify Florida Attorney
22      General's Office -- AG Office -- that mortgagor's
23      will not respond to any of our outreach, and that
24      they do not have any additional contact
25      information."  Do you see that?
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1            THE WITNESS:  I see the comment about written

2      request received, complaint received, acknowledgment

3      letter sent, and Kevin Smith, myfloridalegal.com,

4      and I see the other comment you were referring to

5      earlier about lack of response.

6   BY MR. STEELE:

7      Q.   All right.  And then on March 19th of 2014, do

8   you see where it says that apparently you called

9   772-406-69 (sic) --

10           THE COURT:  You, being the company?

11           MR. STEELE:  Nationstar, I'm sorry.

12           THE COURT:  Okay.

13           MR. STEELE:  Nationstar, call back, no answer.

14           THE WITNESS:  Yes, I do.

15   BY MR. STEELE:

16      Q.   Then, do you see on Page 16 where somebody

17   tried calling again on Mar -- on April the 10th of

18   2014 to 772-406-69 (sic), and the telephone was

19   disconnected -- the second entry?

20      A.   Yes, I do, but the prior entry or two entries

21   before that, we called the 408 number and left a

22   message -- a voicemail to follow up.  And then we also

23   did that on March 19, 2014 in between these dates that

24   you are referring to, and we called the 408 number and

25   left a message again.

                                                    116

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    Q.   And does it indicate that somebody -- that you

2    weren't getting cooperation or that nobody was calling

3    you back when you called the 408-6969 number rather than

4    the 406-6969 number?

5    A.   Well, according to what I see, it looks like we

6    didn't receive a response from either number in between

7    the dates that we -- you just mentioned in the last two

8    or three questions.

9    Q.   Let's talk about the -- Exhibit 10, which is

10   the breach letter dated September 26th of 2014; do you

11   have that up there or do I need to get that one for you?

12   A.   I believe it is up here.  Just a moment,

13   please.  I do have it, yes.

14   Q.   The amount that's demanded in the September 26,

15   2014 letter is $26,223.48.  Do you know how Nationstar

16   arrived at that number that Mr. Akowskey would have to

17   pay in order to satisfy this -- this demand?

18   A.   Yes.

19   Q.   And -- and how -- what -- what is that number

20   representative of?

21   A.   It's representative of the past due contractual

22   payments, which are 28 payments, and the five percent

23   late charge for every -- the late charge that was

24   assessed due to a payment being received -- an

25   incomplete payment being received after the 16th of the

117

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1    month.  In addition to that, there were some advances on

 2    the loan as well.

 3         Q.   Was any of that breakout explained in this --

 4    this breach letter, this Exhibit 10?

 5         A.   Not line by line, but that paragraph which --

 6    it has the $26,000 figure.  It -- if I can read it, "As

 7    of the date of this letter, the total monthly payments,

 8    including principal, interest and escrow, if applicable,

 9    late fees, NSF fees, and other fees and due under the

10    terms of the loan documents are past due in the amount

11    of $26,223.48."  And that's --

12         Q.   The -- there came a point after the lawsuit was

13    filed and af -- and long after this letter was sent --

14    this demand letter was sent -- where Nationstar tried to

15    return the 13 payments that Mr. Akowskey had made to

16    Bank of America; is that correct?

17         A.   I missed the first part of your question; I

18    apologize.

19         Q.   Yes.  There -- there came a time long after the

20    complaint was filed and long after this letter was sent

21    in September of 2014, when Nationstar attempted to send

22    back to Mr. Akowskey those 13 payments that he had made

23    as what you are representing as part of the trial

24    modification; is that correct?

25         A.   Yes.  Not only did we attempt to but, in fact,
```

118

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    we did send it back, and those were amounts that were

2    placed in a suspense account because they were a part of

3    loss mitigation that was not successful, and that's why

4    we sent it back.

5         Q.   And according to the records that I have

6    here -- or a check that I have here -- you sent that

7    check back to him for a little over $6,000 on June

8    the 3rd of 2015; is that correct?

9         A.   Could you please repeat the date?

10        Q.   Yes, June the 3rd of 2015 is the check that I

11   am looking at from Nationstar to Mr. Akowskey?

12             MR. BARSKY:   And where is that -- where is that

13        from?

14             MR. STEELE:   Nationstar.

15             MR. BARSKY:   No.   What document is this from?

16             MR. STEELE:   It was one of my exhibits or one

17        of the ones that I sent to you all as part of my

18        exhibits.

19             MR. BARSKY:   So it's not in evidence right now?

20             MR. STEELE:   No.   I am just asking if -- if you

21        can tell from the business records if that's when

22        this check was sent out or -- or if you have a date

23        different than that as the date that you sent --

24        that -- that this payment was sent back to

25        Mr. Akowskey.

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
1              THE WITNESS:  And that was June 2015 --
2         MR. STEELE:  Correct.
3              THE WITNESS:  -- that you had referenced?
4         MR. STEELE:  Yes; Check No. 3848302 for
5    $6,135.87.
6              THE WITNESS:  From the comment log, I see an
7    entry on April 29, 2015 and it reads, "Stop pay
8    issued on previously issued check.  Check stopped
9    and reissued in the amount of $6,135.87."
10             And then there is another entry relating to the
11   same figure on June 2, 2015, "Stop pay issued on
12   previously issued check.  Check stopped and reissued
13   in the amount of $6,135.87."
14             And I believe there was some issue about the
15   borrower receiving the check, and so we reissued the
16   check so that we can try to get the money to the
17   borrower.
18             And I believe there may have been another
19   attempt which was not returned -- if you can bear
20   with me here.  Those are the ones that I see at the
21   moment.
22   BY MR. STEELE:
23        Q.  So these dates in 2015 were long after the
24   complaint was filed in November of 2014 and long after
25   the -- the default letter was sent in September of 2014;
```

120

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1   correct?

2       A.   Those are a lot of dates.  Could -- could we go

3   down the list one-by-one so I can be sure --

4       Q.   All right.

5       A.   -- that I am giving you the correct answer.

6       Q.   Well, let me just ask you this.  So, if I

7   understand it correctly, you had $6,135 of

8   Mr. Akowskey's money that you had in a suspense account

9   from the time that you took over the servicing of this

10  loan in November of 2013 until you finally sent it back

11  to him in April, May or June of 2015; correct?

12      A.   That's a partial description.  But, yes, the

13  funds were in a suspense account.  They were set aside

14  and not applied to the loan.  And that was done because

15  our process is, if there is loss mitigation and partial

16  payments are received, they are set aside and not

17  applied to the loan.  They were applied to the loan by

18  Bank of America.

19          But since the modification was not completed,

20  when it boarded our system we -- we corrected that and

21  placed the funds in a suspense account.  And we actually

22  attempted to honor the modification that was offered by

23  Bank of America, but because we did not have any luck in

24  finalizing the loan modification, we ended up sending

25  the funds back to Mr. Akowskey.

121

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      Q.   So at the time that you sent him this demand
2 letter on September 26, 2014, you had $6,000 of his
3 money sitting -- 6,100 and something dollars -- of his
4 money sitting in a suspense account that was not applied
5 to his loan; correct?
6      A.   That was September 2015.
7      Q.   Yes -- 2014.
8      A.   May I also look at the payment history because
9 the comments that I --
10          THE COURT: Well, that's what I am looking at.
11          THE WITNESS:  Okay.
12          THE COURT:  I will give it to you in a second.
13          THE WITNESS:  The payment history would also
14     refresh my memory, Counselor --
15          MR. STEELE:  Which one?
16          THE WITNESS:  I -- I will wait for the Court to
17     review the document.  And your -- your question was,
18     did we return the funds after the breach letter?
19 BY MR. STEELE:
20      Q.   No.  I am saying -- I thought that you said
21 that you set aside this $6,000 that represented these 13
22 payments that Mr. Akowskey made as part of his trial
23 payment plan in -- in a suspense account; is that
24 correct?
25      A.   Yes, that's correct.

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1       Q.   And so, therefore, when you sent him this

2   demand letter for $26,233.48 you were not giving him

3   credit for the $6,000 that you had of his that was right

4   -- that you subsequently returned to him well after

5   this -- this demand letter was sent?  Where -- where was

6   that money, the $6,000, when you demanded this $26,000?

7       A.   It was in a suspense account.

8       Q.   So you had his money that was rightfully his --

9   $6,000 of his money -- and you are demanding an

10  additional $26,000 to bring the loan credit rather than

11  -- to bring the loan current rather than crediting him

12  the $6,000 so that he really in order to bring the loan

13  current only had to pay the 20?

14      A.   The figure in the breach letter is the cure

15  amount and, yes, that $6,000 figure was in a suspense

16  account at the time, as we -- we were hopeful that we

17  could resolve the mod issue.

18      Q.   But you had $6,000 of his money.  Why didn't --

19  why didn't you demand $20,000 from him rather than 26 if

20  you had $6,000 that was his money?

21      A.   That's the number that appears on the breach

22  letter, and I can't change it.

23      Q.   Well, actually, when I look at your payment

24  history, there is a column over on the far -- I'm not

25  good with right and left, but I think that's the right

123

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1   side -- that has suspense; do you see that?

2        A.   Which page are you referring to?  I do the see

3   the column, yes.

4        Q.   Well, I am talking about any of the pages on

5   the detail transaction history.  On the -- do you see

6   the column on the far right-hand side where it says

7   suspense?

8        A.   Yes, I do.

9        Q.   I am assuming that's how much money was in the

10  suspense account at any given time; correct?

11       A.   The $6,135.87?

12       Q.   Well, no.  According to this, let's say, for

13  example, I am looking at Page 8 on December 30th of

14  2014, you only had $15.00 in the suspense account; do

15  you see that?

16       A.   I see the $15.00, but that's actually an

17  advancement for a property inspection, that's not the

18  amount that was in suspense.

19       Q.   Well, how much was in -- total in the suspense

20  account?

21       A.   $6,135.87.

22       Q.   Where is that reflected anywhere in these

23  records that -- that amount of $6,000 was constantly in

24  the suspense account from the date that you all boarded

25  the loan until this was printed in Dec -- in October of

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    2016?

2        A.    So I will explain again about the payments

3    having been applied to the loan during the trial plan by

4    Bank of America.   When it came over, our policy is if --

5    if loss mitigation or final modification is not

6    successful, we place those funds in a suspense account.

7    And so, when it came over, our accounting process set

8    aside those amounts into a suspense account.

9            THE COURT:   His question is and my question is,

10       where is that reflected on the records you have in

11       your hand?

12           THE WITNESS:   It is in the payment history.

13           THE COURT:   Where is it reflected

14       contemporaneous with the dates that are listed on

15       the document?   You did not keep a running total --

16           THE WITNESS:   It is --

17           THE COURT:   Did you not keep a running total of

18       what was in -- what was in the suspense account on

19       each entry?

20           THE WITNESS:   Yes, Your Honor.

21           THE COURT:   Well, Mr. Steele tells me it only

22       shows up one time at the -- at the end of the

23       page -- on the last page.

24           THE WITNESS:   It's not only one time.   Going

25       back to March -- or excuse me -- January 24, 2014,

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      it references miscellaneous suspense, and if you go

2      all the way over you will see $6,135.87 again.

3  BY MR. STEELE:

4      Q.   Right.  And then the next day it shows that

5  money or the -- the following month on March 14th of

6  2014 it shows a suspense account amount of zero.  Where

7  did that $6,135.87 go?

8      A.   The zero -- the zero dollar transaction you are

9  referring to -- what -- what time is -- or what date is

10  that?

11      Q.   It's -- it's Entry 51.  The entry that you say

12  where it's reflected there on January 24, 2014, you are

13  right.  It says there was $6,135.87 in suspense.  But

14  the next entry, 51, right above it, says on March 14th

15  of 2014 there is zero in the suspense account.  Where

16  did that $6,000 go?

17      A.   It remained in the suspense account.  And as

18  you will see in future transactions, that's the amount

19  that we sent back to the borrower and I can --

20          THE COURT:  Sir, that's not an answer.

21          THE WITNESS:  That's my understanding --

22          THE COURT:  That's not -- that's not an

23  adequate answer.  He asked, where did the money go

24  that was -- and you keep -- you keep telling me it

25  was in suspense.  But do you know -- do you know

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1     where the money went or why it doesn't reflect the

2     $6,000 and some odd dollars?

3          If you don't know, you don't know.  I mean --

4     but, the bottom line is, you need to answer the

5     question as -- as asked and not -- and not go off on

6     a tangent there.

7          THE WITNESS:  I don't know why it's not on

8     every entry.

9          THE COURT:  Okay, that's fair enough.  How many

10    times does -- does it show up on your transaction

11    history as being in suspense?

12         THE WITNESS:  If I may look at the transaction

13    history?

14         THE COURT:  I am not expecting you to have

15    total recall.

16         THE WITNESS:  Your Honor, I see that suspense

17    amount of $6,000 seven times in the payment history.

18         THE COURT:  Thank you, sir.

19    BY MR. STEELE:

20    Q.   And how many -- what are the total number of

21    entries, is it 214?

22    A.   Yes, that's correct.

23    Q.   So it shows up seven times in suspense out of

24    214?

25    A.   That's correct.

127

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1        Q.    So do you know where it was going or why it is

 2   not reflected there as a -- as a running tally in

 3   suspense?

 4        A.    I don't know --

 5             MR. BARSKY:   Objection, Your Honor, asked and

 6        answered.

 7             MR. STEELE:   I'm sorry, I'm sorry.  You are

 8        right.  You are right.

 9   BY MR. STEELE:

10        Q.    Do you have anything that has been -- do you --

11   do you -- is there anything reflected in any of these

12   records that you see here before you today that says

13   that Bank of America, during the time that it was

14   accepting these 13 payments from Mr. Akowskey as part of

15   his -- what you call a trial plan, that they were in any

16   way dissatisfied with his compliance with the terms of

17   the -- of the modification agreement -- where they sent

18   him a letter and said, hey, we can't app -- we can't

19   accept your modification or your modification was not

20   approved because you didn't do this or you didn't do

21   that?  Is there anything in any exhibit here today that

22   says that his modification was not approved or not made

23   permanent?

24        A.    I would have to --

25        Q.    Yes or no?
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
1        A.    -- I would have to look at the exhibits --

2        Q.    Sure.

3        A.    -- that you introduced --

4        Q.    Sure.

5        A.    -- when the trial began.

6             MR. STEELE:  Sure.  If I could then, let me go

7    ahead and give him all of the exhibits.

8             THE COURT:  It's 4:35.  Mr. Barsky --

9             MR. BARSKY:  Your Honor --

10            THE COURT:  I mean, he is going to make him

11   look through all of those documents.  I -- I am

12   almost one hundred percent certain that Mr. Steele

13   would not have asked that question if he didn't know

14   the answer, and you probably know the answer too.

15   Do we need to go -- does he need to go through all

16   of those documents?

17            MR. BARSKY:  Well, I have a document that he

18   supplied to me that ind -- from Bank of America that

19   does explain it.

20            THE COURT:  Okay.  Well, the ones that are in

21   evidence here --

22            MR. BARSKY:  And they won't.  I can stipulate

23   to --

24            MR. STEELE:  Yeah.  There is nothing --

25            MR. BARSKY:  -- there is nothing in -- in
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1        evidence as of now.
 2             THE COURT:  Okay, nothing in evidence as of now
 3        that says that.  Thanks for the stipulation.  Okay.
 4             MR. STEELE:  I have nothing further.
 5             THE COURT:  Mr. Barsky.
 6                       REDIRECT EXAMINATION
 7   BY MR. BARSKY:
 8        Q.   In your testimony you indicated with regard to
 9   the due date, meaning the date in your letter -- you
10   were going to explain from the payment history why your
11   date was the date it was?
12        A.   Yes.
13             THE COURT:  The June 1st date, is that what we
14        are talking about?
15             MR. BARSKY:  The breach date that --
16             THE COURT:  The June 1st --
17             MR. BARSKY:  2012.
18             THE WITNESS:  That's correct.
19   MR. BARSKY:
20        Q.   Okay.  And how did you -- from the payment
21   history how did you arrive -- does that indicate -- you
22   were about to explain it and he cut you off and said
23   that -- would you please explain why that is the breach
24   date?
25        A.   Yes.  As part of our boarding process, we
```

130

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    reviewed the payment history and business records of

2    Bank of America.  And the due date was adjusted because

3    our procedure is not to apply partial payments but to

4    place them in a suspense account, unless the loan

5    modification or any other type of loss mitigation is

6    successful.

7            THE COURT:  But your transaction history shows

8        he was actually paid up through December.

9            THE WITNESS:  That's what it came over as, but

10       if -- if you look up in -- in the history as --

11       probably by the seventh or eighth transaction, you

12       will see the adjustment reflecting the adjustments

13       from the principal, the interest and escrow that was

14       paid as part of those partial payments, and that's

15       where the $6,000 figure comes from is, and instead

16       it was placed into suspense in the hopes that we

17       could work something out in the way of a

18       modification.

19           THE COURT:  Why did it take 13 payments for you

20       all to figure out that you were not accepting the

21       modification?

22           THE WITNESS:  We actually wanted to accept the

23       modification.  The payments were accepted by Bank of

24       America, the predecessor to -- to us for servicing

25       purposes.  They accepted the payments.  We attempted

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1      to honor the loan mod, but there was two -- there

 2      was two signatures required on the loan.

 3           THE COURT:  Well, where is there any

 4      information that you sent Mr. Akowskey that you

 5      weren't accepting the modification because his wife

 6      didn't sign off on it?

 7           THE WITNESS:  There is some information

 8      relating to that by Nationstar in our coll --

 9      collection log that's in evidence.

10           THE COURT:  Okay.  Any further questions,

11      Mr. Barsky?

12           MR. BARSKY:  Yes.

13 BY MR. BARSKY:

14      Q.   Did you -- did you ever receive any written

15 notification from the borrower indicating that he wanted

16 other contact information -- mail sent to any other

17 address other than the address pursuant to the mortgage?

18      A.   Nothing that changed the address for mailing

19 purposes on the loan.  We did receive authorization to

20 speak with counsel, but that by itself does not change

21 an address for mailing purposes.  As the mortgage

22 indicates, it needs to be in writing if the mailing

23 address is to be changed, and that did not happen

24 according to my review of our business records.

25           MR. BARSKY:  Your Honor, I do have another
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1     exhibit that I -- in rebuttal to what he -- his
 2     cross-examination.  It is a letter from Bank of
 3     America explaining the declining of the loan
 4     modification.  I would offer it as Plaintiff's
 5     No. 13 (sic).  It's in rebuttal.  He provided this
 6     to me in his exhibits.
 7          THE COURT:  Well, this is re -- rehabilitation?
 8          MR. BARSKY:  It is an -- it's -- it's -- it was
 9     in response to their complaint to the Attorney
10     General's Office.  This is Bank of America's
11     response.
12          MR. STEELE:  Well, how is this a business
13     records of yours if -- if it wasn't in your records?
14          MR. BARSKY:  You were introducing business
15     records from Bank of America on your case, and I am
16     just trying to --
17          MR. STEELE:  Because they were records --
18          MR. BARSKY:  They were not my records.  These
19     are --
20          MR. STEELE:  Well, this is a letter from Bank
21     of America to the Akowskeys.  I don't understand how
22     that would count as a business record or -- or why
23     he wouldn't have introduced this in the case in
24     chief.
25          MR. BARSKY:  Well, because you were questioning
```

133

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
1    him --
2         THE COURT:  Well, he is not over -- his case in
3    chief isn't -- isn't over.
4         MR. STEELE:  I understand.
5         MR. BARSKY:  And I would like to reopen my case
6    in chief so I can --
7         THE COURT:  Your case in chief never stop --
8    never stopped being open so.  You are seeking to
9    introduce that?
10        MR. BARSKY:  Yes.  I would like to introduce
11   it.
12        THE COURT:  And your legal objection is what?
13        MR. STEELE:  That there is no -- it hasn't been
14   established -- I don't --
15        THE COURT:  Well, it hasn't been established --
16        MR. STEELE:  -- proper foundation --
17        THE COURT:  You are right.  There hasn't been
18   proper --
19        MR. STEELE:  -- and lack of trustworthiness.
20        THE COURT:  There hasn't been a proper --
21        MR. STEELE:  Those are my two objections.
22        THE COURT: -- foundation.  So, if you could lay
23   the foundation, that would be great.
24        MR. BARSKY:  What was my last exhibit, please?
25        THE CLERK:  This will be 18.
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
1              (Plaintiff's Exhibit 18 was marked for
2    identification.)
3    MR. BARSKY:
4         Q.   I am showing you what's been marked as
5    Plaintiff's Exhibit No. 18.  Do you recognize that
6    document?
7         A.   And your question is, do I recognize it?
8         Q.   Do you recognize it, yes.
9         A.   Yes, I do.
10        Q.   And was this document obtained from Bank of
11   America and gone through your boarding process?
12        A.   Yes, because --
13        Q.   Okay.
14        A.   -- because our boarding process is ongoing,
15   yes.
16        Q.   And was that document made in the regular
17   course of conducted business?
18        A.   As determined by our on-boarding process, yes.
19        Q.   Is it a record that is routinely made and kept
20   in the course of business in the business's usual
21   practice?
22        A.   As determined by our on-boarding process, yes.
23        Q.   And was it made at or near the time of the
24   occurrence?
25        A.   Again, as -- as it relates and was determined
```

135

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1    by our on-boarding process, yes.
 2        Q.   And was it made by a person with knowledge or
 3    from information transmitted by a person with knowledge
 4    reporting such?
 5        A.   Yes, subject to our boarding process, which
 6    subsequently became integrated into our business
 7    records.
 8             MR. BARSKY:  And we would offer the --
 9             THE COURT:  What's the date of the -- the date
10        of the letter?
11             THE WITNESS:  It's November 18, 2013.
12    BY MR. BARSKY:
13        Q.   And was -- was that before or after you took
14    over the servicing?
15        A.   It is after, but if there are correspondences
16    by a prior servicer we ask for them.  Yes.  We ask for
17    anything that goes out, even after our servicing begins
18    because we like to be aware of any issues with the loan.
19             THE COURT:  The date of that letter is what?
20             THE WITNESS:  November 18, 2013.
21             THE COURT:  Which is almost a year before you
22        sent the demand letter to Mr. Akowskey; correct?
23             THE WITNESS:  A year before the demand letter,
24        yes, nearly.
25             THE COURT:  So you accepted --
```

136

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1          MR. STEELE:  Judge, the -- the only other

2      objection that I would have to this letter is that I

3      did do extensive discovery before this and asked for

4      any and all communications.  This letter was never

5      produced.

6          MR. BARSKY:  You produced it to me.

7          MR. STEELE:  I don't care.  What I am saying

8      is -- and I also asked for any exhibits that he

9      would be testifying to.  And, I specifically said to

10     you, do you have any other exhibits that came from

11     Bank of America when you boarded this loan, other

12     than what you have given me in your deposition

13     today, and he said, no.

14         So this is not a letter that was produced in

15     discovery or was produced at his deposition as

16     something that was given to them during the boarding

17     process so -- or that they had any knowledge of it.

18         MR. BARSKY:  It was his doc -- Your Honor,

19     it's -- I am producing his own trial exhibit.

20         THE COURT:  Yeah.  I think you opened the door.

21     The objection is overruled.  But I am trying to see

22     when -- when were the -- tell me the date of that

23     again?  I'm sorry.

24         THE WITNESS:  It is dated November 18, 2013.

25         MR. STEELE:  Which was 11 months after -- or 12

137

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1        months after they had taken over the servicing of
 2        the loan.
 3              THE COURT:  And the 13 payments were made --
 4              MR. STEELE:  From June of 2012 through
 5        September of 2013.
 6              THE COURT:  Okay.  The objection is overruled.
 7        It will be introduced evidence as Plaintiff's 18?
 8              THE CLERK:  Eighteen.
 9              (Plaintiff's Exhibit 18 was admitted into
10        evidence.)
11        BY MR. BARSKY:
12           Q.   And does that letter indicated the reason why
13        the loan modification was denied?
14              MR. STEELE:  Objection, the letter speaks for
15        itself.
16              THE COURT:  I can read the letter, thanks.  The
17        objection is sustained.
18        BY MR. BARSKY:
19           Q.   And based on your recoll -- your reviewing the
20        file, what was the reason that the loan modification was
21        denied?
22           A.   Because there was only one signature on the
23        loan modification -- the final loan modification
24        agreement, where there are two borrowers on the loan.
25        Without a quit -- a quitclaim deed and also some sort of
```

138

Atkinson-Baker Court Reporters
www.depo.com

```
 1    divorce decree, we could not remove Mrs. Akowskey at the
 2    time from the loan or exclude her from a final loan
 3    modification agreement.  That is why we continued to
 4    attempt to obtain either the signature or those
 5    documents to be able to honor Bank of America's loan
 6    modification agreement.  But since that did not occur,
 7    we did not receive any documentation importantly --
 8          THE COURT:  But -- but Bank of America was okay
 9      with it.  They accepted 13 payments; didn't they?
10          MR. BARSKY:  Not according to that letter, Your
11      Honor.
12          MR. STEELE:  Well --
13          THE COURT:  Let me take a look at it.  Okay.
14      So in this letter, it says, "Our records indicate
15      the loan amount -- the loan account was paid through
16      and including the December 2012 installment."  But
17      your demand letter says it was the June 1
18      installment; right -- June 1, 2012.
19          THE WITNESS:  That is correct, Your Honor.
20          MR. BARSKY:  And the reason the --
21          THE COURT:  Hold on.  "The loan account was
22      referred to our foreclosure department on March 30,
23      2012, but a foreclosure sale was not completed."
24      That's gibberish.
25          MR. BARSKY:  Yeah.
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1        THE COURT:  "For the current status of the

2    mortgage loan account, including foreclosure and

3    loan modification reviews, please contact Nationstar

4    Mortgage, LLC, at 1-877-372-0512 at extension 16."

5        "In an effort to prevent the loan" -- "In an

6    effort to prevent the permanent loan modification

7    from being declined between January and September

8    2013, Bank of America accepted and applied payments

9    in the amount of" -- I supposed that is supposed to

10   be a dollar sign, but it has a capital "S" --

11   $755.21 while making multiple requests for the

12   fully-executed modification agreement or a divorce

13   decree and quitclaim deed.  These documents were

14   required to execute the modification with only one

15   borrower."

16       Mr. Barsky, do you have any copies of these

17   multiple requests as referenced in the letter?

18       MR. BARSKY:  No, we don't, Your Honor.

19       THE COURT:  Okay.  "By September 2013, Bank of

20   America had not received the fully-executed loan

21   modification agreement or the requested documents.

22   Therefore, the loan modification was not honored,

23   and the loan modification review was canceled.

24       "At the present time, we are unable to offer a

25   substitute modification because of the service

140

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    release.  When payments are made according to an

2    agreed upon workout arrangement, such as a loan

3    modification TPP, generally, the amount of each

4    payment is less than the originally scheduled

5    mortgage installment amount.

6         "In such cases, payments received are held in a

7    non-interest bearing suspense account, also known as

8    a partial balance account, until the payments total

9    an amount that is enough to pay the oldest

10   delinquent monthly payment in full.  Should there be

11   other amounts due, such as tax payments or insurance

12   premiums, these payments are made before the past

13   due loan payment.

14        "The payments Bank of America received in the

15   amount of $755.21 were applied to the loan account

16   according to the loan terms.  When a loan account is

17   in a for -- in a for -- is in foreclosure, it is no

18   longer in an active modification review.

19        "Bank of America is unable to accept payments

20   unless they are in certified funds and for an amount

21   that would satisfy the full amount required to bring

22   the loan account current.  I understand any

23   inconvenience this may have caused."

24        As the Court believes, that's an

25   understatement.

141

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1          "Mr. Akowskey and Ms. Akowskey, I understand

2     the level of service and communication you received

3     from Bank of America may not have met your

4     expectations.

5          "I also understand that this may not be the

6     result or resolution you were hoping for, but I hope

7     I have been able to clarify matters in a way that

8     enhances your understanding of the reasons" --

9     reasons for our decisions" -- in plural.

10         "Thank you for bringing your concerns to our

11    attention.  We value your feedback as an opportunity

12    to evaluate and improve the service we provide to

13    all of our customers", et cetera, et cetera.

14         So this letter was sent November 8, 2013 --

15    sorry, November 18, 2013, and the demand letter was

16    sent on June 12, 2013.  So this letter explaining

17    that the modification has been denied came out five

18    months after the demand letter?

19         MR. BARSKY:  It was in response to the

20    complaint that was filed with the AG's Office.

21         THE COURT:  But five months after the demand

22    letter goes out saying you owe 26,000 and some odd

23    dollars, they sent a letter explaining why the

24    modification wasn't approved; is that what you are

25    telling me?

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
1              MR. BARSKY:  I am just -- I am just -- that
2       letter was an explanation based on the complaint
3       that was filed by the defense counsel.  So I am just
4       showing -- it gives an explanation of why the loan
5       was not modified.
6              THE COURT:  Okay.  Well, you -- there is an
7       unclean hands defense here so.  Okay, thanks.  Any
8       other questions of this witness?
9  BY MR. BARSKY:
10      Q.   Was the -- did those documents ever provide --
11 did you ever receive a completed modification signed by
12 both parties?
13      A.   No.
14      Q.   Did you ever receive a divorce decree and a
15 quitclaim deed?
16      A.   We received neither.
17      Q.   And -- and what's the -- is that the reason why
18 the loan was not modified?
19      A.   Yes.
20             MR. BARSKY:  I have no further questions.
21             THE COURT:  Anything more of this witness?
22             MR. STEELE:  No, Your Honor.
23             THE COURT:  Thank you, sir.  You can step down.
24             THE WITNESS:  Thank you, Your Honor.
25             (The witness stepped down.)
```

143

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1              THE COURT:  Any other witnesses?

 2              MR. BARSKY:  No.

 3              THE COURT:  Okay.  Because I heard your

 4      witness -- I don't know if you can make a motion to

 5      dismiss at the end of the plaintiff's case.

 6              MR. STEELE:  I think I probably can't.

 7              THE COURT:  You may have waived that.  Okay.

 8              MR. STEELE:  I didn't reserve that; right.

 9              THE COURT:  Okay.  All right.  So closing

10      argument, Mr. Barsky.

11              MR. BARSKY:  Your Honor --

12              THE COURT:  And before you go there, I have

13      some questions.

14              MR. BARSKY:  Yes.

15              THE COURT:  So Mr. Akowskey is a disabled --

16      disabled military veteran who is in the process of a

17      divorce, makes what he claims to be his -- his

18      partial modification payments, which only -- only

19      three were required, but he actually makes nine.

20              And, after the demand letter is sent to him

21      saying he is in default, he gets a letter from the

22      bank saying we are not accepting your payments that

23      you made --

24              MR. BARSKY:  May I look at that demand

25      letter -- the letter from the bank because I --
```

144

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1              THE COURT:  Please.

 2          MR. BARSKY:  My understanding was it was before

 3      the demand letter went out.

 4              THE COURT:  The demand letter is 10.  The

 5      demand letter is dated --

 6          MR. STEELE:  I think it was September.

 7              THE COURT:  September 26, 2014 -- 2014.  So the

 8      demand -- okay.  So the demand letter --

 9          MR. BARSKY:  So the demand letter -- so I just

10      wanted to explain it to you.  So it came --

11              THE COURT:  And the demand letter went out

12      after the -- November 18th.

13          MR. BARSKY:  After that letter went out, yeah.

14              THE COURT:  Okay.

15          MR. BARSKY:  That's why I just wanted to

16      explain it to you.

17              THE COURT:  That makes me feel a little bit

18      better, okay.

19          MR. BARSKY:  So he was explained why the

20      loan -- loan modification wasn't --

21              THE COURT:  But he had already made his nine

22      payments.

23          MR. BARSKY:  Your Honor, there was no -- he

24      needed to complete the -- the modification in order

25      to get a final modification.  He never provided
```

145

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      the --

2          THE COURT:  Well, if the bank takes the nine

3      payments, how is that not an acceptance of the

4      modification -- of the modification agreement.  They

5      only had to accept -- they only had to -- they

6      only -- all the -- he only had to pay three but he

7      paid nine, and the bank accepted nine.

8          MR. BARSKY:  They were trying to -- they were

9      trying to work it out with him and trying to get the

10     documents from him.

11         THE COURT:  Well, I am reading Nolan v.

12     Nationstar Mortgage -- which Mr. Steele gave me --

13     193 So.3d 1043 (Fla. 2d DCA 2016).

14         "When a party accepts the benefits under a

15     contract, courts must ratify the contract even if

16     that party contends that it had a contrary intent."

17         And they cited Stevenson v. Stevenson,

18     S-t-e-v-e-n-s-o-n, 661 So.2d 367 (Fla. 4th DCA

19     1995).  "Thus, by accepting the benefits of the loan

20     modification, Nationstar cannot now question the

21     validity -- the validity of the contract.  Having

22     entered into a valid modification agreement,

23     Nationstar could only foreclose by alleging and

24     proving a breach of the modification agreement, and

25     neither of which was done here."

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1          MR. BARSKY:  It's my position, Your Honor, that
 2     the modification never came into existence because
 3     they never executed the final modification documents
 4     or provided the documentation so that only one
 5     borrower would be able to execute the document.
 6          So the fact that -- in the case -- in the case
 7     provided by opposing counsel, there was -- there was
 8     a modification already entered into and they
 9     continued to make payments.
10          Here, there was never a modification because
11     they never completed the modification by -- by
12     submitting the required documentation.
13          THE COURT:  Okay.  You can continue, thanks.
14     Your closing, whenever you are ready.
15          MR. BARSKY:  Your Honor, we have provided
16     documentation indicating that there was a contract
17     between the parties, the note and mortgage.
18          We were able to show that the modification --
19     the -- I'm sorry -- the -- the mortgage and the note
20     were breached by failing to make a payment.  We also
21     showed that there was damages.  So we proved a prima
22     facia case of a mortgage foreclosure action.
23          We have shown and produced documentation that
24     there was no -- never anything in writing indicating
25     the change of address requested.  All documentation
```

147

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1       then went to the borrowers' residence.

2            There was at least constructive compliance with

3       the -- Paragraph 22 in sending the demand letter.

4       And we believe that we have sufficiently shown

5       objective -- shown sufficient evidence to obtain a

6       judgment in this matter in the amount of $106,000

7       and change.

8            THE COURT:  Okay.  Well, I will let you -- give

9       you a chance to address 177 So.3d 1282 -- which was

10      given to me by Mr. Steele.  It's Kuehlman,

11      K-u-e-h-l-m-a-n, versus Bank of America, which is

12      found at, once again, 177 So.3d 1282 (Fla. 5th DCA

13      Oct. 2015).

14           They cite the following facts:

15           "The following facts were established at trial

16      by lender's representative and are not disputed.

17      Lender offered borrower a modification and the terms

18      of the offer required him to accept it by a certain

19      date.

20           "Borrower executed the agreement but returned

21      it late, along with the first modified payment,

22      which was also late.  Borrower then made six

23      additional payments in the modified amount, all of

24      which were late but which lender accepted and

25      deposited.

148

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1           "At that point lender's quote/unquote

2      "investor" (Fannie Mae or Freddie Mac), which was

3      not a party to the contracts instructed lender to

4      quote/unquote, "pull the plug on" or quote/unquote

5      "not accept" the modification.

6           "Then after accepting two additional modified

7      payments, lender accelerated the mortgage, gave

8      borrower an opportunity to cure based on the

9      original mortgage, not the modification, and refused

10     to accept additional modified payments."

11          "Lender sued alleging breach of the original

12     note and mortgage.  Lender argues that no

13     modification occurred because of borrower's late

14     acceptance.  However, borrower's late acceptance of

15     the modification operated as a counteroffer.

16          See, 2 Williston on Contracts, Section

17     6:56-6:57 (4th ed., updated May 2015). See also,

18     Grant, G-r-a-n-t, v. Lyons, L-y-o-n-s, 17 So.3d 708

19     (Fla. 4th DCA 2009).  Acceptances can turn into

20     counteroffers either by adding additional terms or

21     not meeting the terms of the original offer.

22          "On these undisputed facts, we conclude as a

23     matter of law that lender accepted the counteroffer

24     by a combination of its many months of silence and

25     its acceptance of nine monthly payments in the

149

Trial
November 16, 2016

1   amount specified in the modification agreement.

2   "As argued by borrower and because the parties

3   entered a modification agreement following

4   borrower's alleged breach of the original mortgage,

5   lender could only foreclosure by alleging and

6   proving a breach of the modification agreement.  It

7   failed to plead that theory nor was the theory tried

8   by consent."

9   It's an opinion by Judge Lawson, Judge Torpy

10   and Judger Berger.  Judge Lawson and Judge Torpy

11   are -- Judge Lawson and Judge Berger are on the

12   short list for the Supreme Court or will be for the

13   fifth -- position on the Fifth DCA to the Florida

14   Supreme Court.

15   So, the bottom line is, how does this case

16   differ from your situation in this case?

17   MR. BARSKY:  The modification that was provided

18   by them clearly indicated that it had to be executed

19   by all borrowers and it wasn't.

20   THE COURT:  Right.  And this modification in

21   the Kuhn case -- Kuehlman case required it be paid

22   on time.

23   MR. BARSKY:  But here -- and there at least it

24   was executed.  In our case, it was never a completed

25   modification.  It was never executed by both

Atkinson-Baker Court Reporters
www.depo.com

```
1        parties.  So, therefore, there was never a
2    modification.
3            THE COURT:  But your -- your position is --
4            MR. BARSKY:  That there is no modification.
5            THE COURT:  No modification because he never
6    signed it?
7            MR. BARSKY:  No, not -- it wasn't signed by
8    both parties.
9            THE COURT:  He signed it.
10           MR. BARSKY:  He signed it.
11           THE COURT:  Yes, but the -- the wife -- the
12   wife, and now the ex-wife, didn't sign it.
13           MR. BARSKY:  Right.  And --
14           THE COURT:  How was that not a counteroffer by
15   him just signing it himself?
16           MR. BARSKY:  It wasn't signed by Bank of
17   America either.  So it wasn't --
18           THE COURT:  But you all accepted the nine
19   payments, and you see I am having difficulty with
20   the nine payment situation.
21           MR. STEELE:  It was actually 13 in this -- in
22   our case.
23           THE COURT:  Thirteen payments.
24           MR. STEELE:  Yeah.  There was three initial,
25   and then there were ten after that --
```

151

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1              THE COURT:  And ten after that.
 2              MR. STEELE:  -- that were accepted.
 3              THE COURT:  It just seems horribly
 4     inequitable -- inequitable to me that Bank of
 5     America accepted these payments from Mr. Akowskey
 6     and he relies on that.  And then later on the
 7     servicer says, similar to the case in Kuehlman, the
 8     investor pulls the plug.
 9              It just -- I mean, I have got to look at -- I
10     know equity follows the law, but the law here is on
11     Williston on Contracts and it says it can be
12     considered a counteroffer.
13              I don't know it just seems -- it seems -- I'm
14     just -- I'm struggling.  So that's why in your
15     closing argument, I -- I want you to address that.
16              MR. BARSKY:  And my argument is there was never
17     any loan modification ever entered into because it
18     wasn't signed by the parties.  It was advised that
19     he needed to either provide a divorce decree or a
20     quit -- and a quitclaim deed or have her sign it.
21              So, therefore, there was never a modification.
22     They were trying to -- while they were trying to get
23     the initial documentation they wanted him to -- they
24     continued to take the payments so that when -- if
25     he -- they were -- if he was able to comply with the
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1        terms of the agreement they would be able to go

 2        forward with it, but he never did.

 3             THE COURT:  But where is any of that evidence

 4        in writing other than that letter of response to the

 5        Attorney General's inquiry?

 6             MR. BARSKY:  It was in the comment log, too.

 7             THE COURT:  It was what?

 8             MR. BARSKY:  The comment log indicated it.

 9             THE COURT:  Yeah, but the letter that -- from

10        the -- that was the response to the Attorney General

11        says we have been --

12             MR. STEELE:  For -- for what it's worth, Judge,

13        it's our position --

14             THE COURT:  Hold on, hold on.

15             MR. STEELE:  I'm sorry.

16             THE COURT:  "While making multiple requests for

17        the fully-executed modification agreement or a

18        divorce decree and quitclaim deed" --

19             "In an effort to prevent the permanent loan

20        modification from being declined between January and

21        September of 2013, Bank of America accepted and

22        applied payments in the amount of $755.21 while

23        making multiple requests for the fully-executed

24        modification agreement."

25             And you say the collection notes indicate that
```

153

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    there were verbal requests from January through

2    September 2013?

3         MR. BARSKY:  No, no, no.  No, Your Honor,

4    because they were -- that was Nationstar -- that was

5    Nationstar's collection comments, and they don't

6    have anything in there, no.

7         THE COURT:  Okay.  Well, do you have any

8    competent substantial evidence to backup this

9    statement that Bank of America made, "In an effort

10   to prevent the permanent loan modification from

11   being declined, that Bank of America made inquiries

12   from January and September 2013 and that they were

13   making multiple requests for the fully-executed

14   mod -- the fully-executed modification agreement"?

15        MR. BARSKY:  Just that that letter is from Bank

16   of America.  So that is -- that is them indicating

17   that they have made multiple attempts.

18        THE COURT:  Okay.

19        MR. BARSKY:  And the loan modification

20   agreement that they submitted indicates that it has

21   to be signed by all parties.

22        THE COURT:  All right.  Mr. Steele.

23        MR. STEELE:  Yes.  The -- first of all, I want

24   to talk about that letter from Bank of America.

25        You know, as -- as indicated that was a letter

154

Trial
November 16, 2016

1    that I believed was extremely self-serving on the

2    part of Bank of America to try to cover their butt

3    after we filed the complaint with the Attorney

4    General's Office to make it look like that they

5    didn't do anything wrong, rather than -- you know --

6    and -- and again my client was pretty good on

7    keeping track and -- anyway.  And then he testified,

8    which was -- which was not disputed that they never

9    contacted him or told him.

10        And the other thing, too, is there -- there --

11   I think that this case is -- both Nolan and Kuehlman

12   in that --  that first of all, there was nothing in

13   the terms of the -- of the settlement agreement that

14   was signed at the mediation between Mr. Akowskey

15   only and the bank that said anything about him

16   having to do anything other than send in those three

17   payments to get the permanent loan modification.

18        The agreement simply says that he shall

19   strictly comply with -- which he did -- the terms of

20   the settle -- of the -- of the modification

21   agreement, which is reflected in that letter.

22        That letter does not say anything that

23   something needs to be signed by both parties.  It

24   doesn't say anything about a quitclaim deed or a

25   divorce or anything else at that point.  It simply

155

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    says that this is all you have to do, and that's

2    what he did.

3        So in my -- in my opinion, you know, Nolan

4    applies because those were the expressed terms of

5    the offer, which he accepted by complying and -- and

6    sending them those three payments, which they

7    promised him not -- the only condition in that

8    letter was that all you need to do is make these

9    three payments, and we will give you a permanent

10   modification.  There is nothing in there, express or

11   implied, or otherwise that says that his wife had to

12   sign it or that he had to get a quitclaim deed from

13   her, or that he had to divorce her at that point.

14       But, as you correctly pointed out, even if

15   there was that kind of a condition in there,

16   Mr. Akowskey's submission of the modification

17   agreement only signed by him constitutes a

18   counteroffer, which the bank remained silent about

19   for not just nine months, but 13 months.

20       And actually longer than that before they

21   finally came -- after we went to the Attorney

22   General's Office and filed the complaint is when

23   they finally came up with this excuse that, oh,

24   well -- and that's exactly what the bank tried to do

25   in the Kuehlman case was they tried to concoct an

Trial
November 16, 2016

```
 1      excuse by saying, well, he didn't -- you know,

 2      and -- and again, it's the same thing.

 3           I mean, the expressed term of the agreement in

 4      the Kuehlman case was that he was supposed to timely

 5      return this document.  I mean -- and it was

 6      expressly in there and that he was supposed to

 7      timely send in these payments, and so his sending

 8      them in late constitutes a counteroffer, I -- I

 9      suppose.

10           But, again, I don't even know that -- that you

11      need to go there because there was nothing in the

12      original offer that he accepted that required him to

13      do anything other than send in those three payments

14      timely, and that was his understanding.

15           You know, they never said to him right after

16      the mediation, well, you need to get your wife to

17      sign it in order to make this valid.  I mean, he

18      went by himself.  He -- you know, they -- they don't

19      even have an indication or a place on there at the

20      mediation where his wife needed to even sign at the

21      mediation as to the agreement.

22           It says, borrower, and it says, not applicable.

23      So -- which would be consistent with what

24      Mr. Akowskey testified to that -- that this -- the

25      purpose of this was not to get a loan modification
```

157

Atkinson-Baker Court Reporters
www.depo.com

1    for he and his wife, but that they were going to

2    give it to him individually and that that's what

3    they were going to modify, but in order to comply,

4    all he had to do was to send in these three

5    payments.

6          The -- additionally, I believe, that there is a

7    problem in that there was not substantial compliance

8    with the sending of the notice of intent letter, in

9    that they misstated -- it appears that they -- they

10   misstated the amount that was due and owing in order

11   to cure the default by -- by well -- by over $6,000,

12   which I don't think is an inconsequential amount of

13   money.

14         And then there is also the problem that they

15   had it in their records that Mr. Akowskey had

16   requested -- and there is a notation in there that

17   the agent said that he agreed that he would from

18   that point forward contact the attorney because

19   Mr. Akowskey was going in for surgery.

20         And, yet, just like they kept calling the wrong

21   phone number, they weren't following their records

22   and -- and sent the letter, instead of to me, sent

23   it to the client, and which he didn't claim because

24   presumably he was still recovering from whatever

25   this surgery was or whatever this hospitalization

158

Trial
November 16, 2016

1    was and assumed that -- that we had gotten the

2    letter, which was the proper notice address.

3         So, for all of those reasons, I believe that --

4    that equity requires that -- you know, we are not

5    looking for a free house.  We are just looking for

6    them to -- to -- to not default him on the

7    basis of -- of his failure to comply with the

8    modification agreement because that wasn't plead,

9    you know, and it was not tried by consent.

10        But he certainly didn't -- you know, the -- the

11   initial mortgage was superceded by the -- the

12   modification.  So -- so, you know, all we are asking

13   the Court to do is not to find him in default here

14   and not to enter judgment.

15        It's not that, you know, he doesn't want to

16   work something out or can't work something out, but

17   the circumstances under which they -- they basically

18   caught him by surprise here after the fact and said

19   you need to get this signature.  It just doesn't

20   seem fair after they accepted the 13 payments.

21        MR. BARSKY:  A very quick rebuttal, Your Honor.

22        THE COURT:  Yeah, hold that thought, because I

23   need to find the note.

24        Paragraph 4(a) of the modification agreement

25   says, "I agree to the following:  That all persons

Atkinson-Baker Court Reporters
www.depo.com

```
1        who signed the loan documents or their authorized
2        representatives have signed this agreement, unless,
3        one, a borrower or co-borrower is deceased; two, the
4        borrower and co-borrower are divorced and the
5        property is being transferred to one spouse in the
6        divorce decree, the spouse who no longer has an
7        interest in the property need not sign this
8        agreement.
9             "Although the non-signing spouse may continue
10       to be held liable for the obligation under the loan
11       documents; or, three, the lender has waived this
12       requirement in writing."
13            I assume you are relying on that?
14            MR. BARSKY:  Yes, plus the fact that -- a very
15       quick rebuttal, just with regard to the settlement
16       agreement -- it was -- it indicates that if you
17       successfully complete the trial plan --
18            THE COURT:  Where are you?
19            MR. BARSKY:  On the settlement agreement at
20       the -- at the mediation.
21            THE COURT:  Well, it has multiple pages.  What
22       are you talking about?
23            MR. BARSKY:  Page --
24            THE COURT:  There is no page numbers.
25            MR. BARSKY:  The second page where it says,
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1      "The parties enter into the following settlement
 2   agreement" and it gives one, two and three.
 3          THE COURT:  Hold on.  My second page says, "My
 4   representations and covenants".  There is not one,
 5   two and three.
 6          MR. BARSKY:  The mediation report?
 7          THE COURT:  Oh, I am looking at the Fannie Mae
 8   modification agreement.
 9          MR. BARSKY:  No, no.  I am talking about the
10   mediation settlement.  I believe it was the -- it
11   was -- it was --
12          THE COURT:  Which exhibit is that?
13          MR. BARSKY:  -- Defendant's Exhibit --
14   Mr. Steele, do you remember?
15          MR. STEELE:  I'm sorry.
16          MR. BARSKY:  Do you -- the mediation report
17   settlement agreement?
18          MR. STEELE:  Yes, that was -- was it No. 5 of
19   ours --
20          MR. BARSKY:  Three.
21          THE COURT:  Three, I'm sorry.
22          MR. BARSKY:  May I approach, Your Honor, I have
23   a copy.
24          THE COURT:  No, that's okay.  Okay.  So, I see
25   one, two, three.  Where does it --
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1          MR. BARSKY:  Number three.  "If you

2     successfully" -- "Upon successful completion of the

3     trial plan, the terms of which control, the

4     borrowers, plural, shall be provided with a

5     permanent loan modification package, the terms of

6     which control."

7          So, they were provided a permanent loan

8     modification package which required both parties to

9     sign, and they didn't sign it.

10         THE COURT:  And where does it say -- where does

11    it say that both parties are required to sign?

12         MR. BARSKY:  The borrowers shall be provided

13    with -- that was just in the modification not -- not

14    in the settlement agreement -- the terms of which

15    shall control.  And, if you go to the -- the

16    modification agreement that was provided, it

17    indicates that all parties have to sign it, and it

18    was --

19         THE COURT:  Where does it say that?

20         MR. BARSKY:  In the -- in the loan modification

21    agreement, not -- not in the settlement.

22         THE COURT:  Where does it say in the loan

23    modification agreement that all parties have to sign

24    it?

25         MR. BARSKY:  Can I review the document?

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1              THE COURT:  Sure.

 2              MR. STEELE:  My position --

 3              THE COURT:  Hold on.  He is -- hold on.

 4              MR. STEELE:  All right.

 5              THE COURT:  It is his final argument.

 6              MR. BARSKY:  "That all persons who signed the

 7      loan documents or their authorized representatives

 8      have signed this agreement."  The wife was on the

 9      loan document, and she didn't sign this agreement.

10              THE COURT:  Okay.  And when was that sent out?

11              MR. BARSKY:  That was the -- that was the

12      one -- the loan modification that he signed and the

13      one that he was authorizing.

14              THE COURT:  Okay.  But that was sent -- after

15      that was -- after -- after he returned that, Bank of

16      America accepted a bunch more payments.

17              MR. BARSKY:  He agreed to this on 1/15/2013.

18              THE COURT:  All right.  So -- but he -- Bank

19      of -- after this was returned, Bank of America

20      accepted a whole bunch more payments.

21              MR. BARSKY:  According to them, they were

22      trying to see if they could get the -- the documents

23      so that the loan modification wouldn't fail, and

24      that's my position, Your Honor.

25              THE COURT:  Okay.  I will give you limited
```

163

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1      re --

 2             MR. STEELE:  My only --

 3             THE COURT:  Your client testified that he was

 4      told over and over again --

 5             MR. STEELE:  Right.

 6             THE COURT:  -- that he didn't need them.

 7             MR. STEELE:  And there was no evidence other

 8      than this self-serving letter from Bank of America.

 9      I mean, if -- if they were trying so hard to do this

10      then, number one, why did they keep accepting the

11      payments for nine months after they -- they sent

12      that.

13             And -- and, again, this is no different than

14      the situation in Kuehlman where supposedly the bank

15      expressly -- I mean, number one, I think that's --

16      they -- they are reneging on their deal that they

17      made back in -- in August when they -- when they

18      didn't say anything about people -- you know, that

19      both parties needed to sign.

20             I mean, the only borrower that's listed in

21      the -- in the mediation is Mr. Akowskey.  And I

22      think the intent -- if you look at the notes and --

23      and who was there, and how he was identified, and

24      they put "n/a" next to co-borrower, this clearly was

25      something that they were negotiating with him and
```

164

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    him alone.

2         The fact that they subsequently four months

3    later decided to send him this letter and said, oh,

4    by the way, you need to get both signatures, to me

5    constituted a counteroffer to what they originally

6    agreed to, to which Mr. Akowskey counter-offered

7    back and said, nope, I am signing it by myself.

8         And just as there was silence on the part of

9    the borrower in -- I mean, the bank in Kuehlman for

10   nine months, there was silence on the part of the

11   bank in this case for nine months by continuing to

12   accept his payments, turn those payments over to

13   Nationstar, who then kept those payments for an

14   additional two years, I think, before they finally

15   returned them to him after they filed the lawsuit.

16        So I don't think that they have anybody to

17   blame but themselves, you know, by there -- you

18   know, there is no evidence of -- of -- that -- that

19   they did anything other than just keep his money,

20   and then try to renege on the deal after they got in

21   trouble with the Attorney General's Office and --

22   and after this lawsuit was filed and they realized

23   that they had a problem on their hand.

24        THE COURT:  Okay.  Thanks.  Mr. Barsky, because

25   you are the plaintiff, you do get the last argument.

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1        So anything else?
 2        MR. BARSKY:  Nothing further, Your Honor.  I
 3   think I have said our position on it.
 4        THE COURT:  The Court finds that the plaintiff
 5   has failed to prove its case by a preponderance of
 6   the evidence with regard to the issues of the
 7   modification -- or the agreement between the
 8   parties.
 9        I don't think they have proved paragraph -- and
10   I believe the affirmative defenses have been proved
11   by more than a preponderance of the evidence as to
12   the first offense, that the plaintiff failed to
13   provide the defendant with a clear and accurate and
14   unequivocal notice of default as required by -- or
15   as in compliance with Paragraphs 6(c) and 7(c) of
16   the note and Paragraph 22 of the mortgage.
17        I don't think that the plaintiff -- the
18   defendant was provided a good faith opportunity
19   pursuant to the mortgage and servicing obligations
20   of the plaintiff to avoid acceleration in this
21   foreclosure.
22        I find that the acceptance of the nine -- or
23   the -- how many months was it, ten months --
24        MR. STEELE:  Thirteen, total.
25        THE COURT:  -- thirteenth months of the
```

166

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1       defendant's modification payments clearly falls into

2       the parameters of Nolan v. Nationstar Mortgage,

3       193 So.3d 1043, and Kuehlman, K-u-e-h-l-m-a-n, v.

4       Bank of America, 177 So.3d 1282.  The lender

5       accel -- the lender accelerated the mortgage and

6       gave the borrower an opportunity to cure based on

7       the original mortgage and not the modification.

8            And I believe that there was an effective

9       modification pursuant to the terms of the mediated

10      settlement agreement, and the plaintiff's refusal to

11      accept the additional payments was -- were waived by

12      the prior acceptance of the 13 payments.

13           Clearly, there was a counteroffer by

14      Mr. Akowskey, and the many months of silence by the

15      plaintiff constitutes an acceptance of the

16      counteroffer as argued by the borrower here -- on

17      behalf -- by Mr. Steele.

18           There was a modification, and it was highly

19      inequitable for the plaintiff to fail to comply with

20      the terms of the modification.  Accepting 12 -- 13

21      months of payments and then trying to just give him

22      the money back after the lawsuit was filed, I think,

23      is evidence of inequitable conduct on the part of

24      the bank, as servicers.

25           Further, the seventh affirmative defense was

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    proved by a preponderance of the evidence, unclean

2    hands on behalf of the plaintiff in trying to obtain

3    equitable relief of foreclosure by the Court.

4         I don't think there were any predatory lending

5    practices, but I do find that the circumstances of

6    the case render acceleration unconscionable.  And

7    the Court is not allowing the acceleration and

8    denying foreclosure because the plaintiff has waived

9    the right to acceleration and is estopped from doing

10   so because of the unfulfilled contractual and

11   equitable conditions precedent.

12        They entered into a settlement agreement

13   regarding modification.  The modification should

14   have gone through based on the terms of the original

15   settlement agreement.  Unilaterally, it was not by

16   the plaintiff, and therefore, the case is dismissed.

17        The plaintiff -- the defendant prevails.  I

18   find the defendant to be the prevailing party.  I

19   reserve as to attorney's fees and costs as may be

20   appropriate.

21        MR. BARSKY:  Thank you, Your Honor.

22        THE COURT:  I think Mr. Barsky and his witness

23   did the best that they could with the facts they

24   were given.  And the facts, I believe, are pretty

25   egregious.  I could be wrong and that's why we have

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1      courts of appeals.  Good luck.  Thanks.

 2           MR. BARSKY:  Thank you, Your Honor.

 3           MR. STEELE:  -- thank you, Your Honor.

 4           THE COURT:  Mr. Steele, if I could have your

 5      proposed order in the next few days?

 6           MR. STEELE:  Yes, Your Honor.

 7           THE COURT:  Thanks.

 8           (The proceedings concluded at 5:29 p.m.)

 9                           *****

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Trial
November 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1                    CERTIFICATE OF REPORTER

 2

 3

 4   STATE OF FLORIDA       )
                            )
 5   COUNTY OF ST. LUCIE )

 6

 7        I, Marialaina Rintone, Notary Public, State of

 8   Florida, was authorized to and did digitally report and

 9   transcribe the foregoing proceedings; and that the

10   transcript, pages 4 through 169, is a true and accurate

11   record of my digital notes.

12

13        I FURTHER CERTIFY that I am not a relative, or

14   employee, or attorney, or counsel of any of the parties,

15   nor am I a relative or employee of any of the parties'

16   attorney or counsel connected with the action, nor am I

17   financially interested in the action.

18        Dated this 1st day of December, 2016.

19

20

21

22

23        _____

24        MARIALAINA RINTONE, CER/CET

25
```

170

Trial
November 16, 2016